**PRIMAVERA FAMILIENSTIFTUNG, on behalf of itself and all others similarly situated, Plaintiff,**

**v.**

**David J. ASKIN; Askin Capital Management, L.P.; Geoffrey S. Bradshaw–Mack; Kidder, Peabody & Co., Incorporated; Bear Stearns & Co. Incorporated; and Donaldson, Lufkin & Jenrette Securities Corporation, Defendants.**

No. 95 Civ. 8905 RWS.

United States District Court, S.D. New York.

June 9, 1997.

Bernstein Litowitz, Berger & Grossmann, New York City (Jeffrey A. Klafter, Robert S. Gans, of counsel), Gold Bennett & Cera, San Francisco, CA (Paul F. Bennett, Solomon B. Cera, of counsel), for Plaintiff.

Shereff, Friedman, Hoffman & Goodman, New York City (Andrew J. Levander, Shari L. Steinberg, David S. Hoffner, of counsel), for Askin Capital Mgt. and David J. Askin.

Morgan, Lewis & Bockius, New York City (Gary G. Staab, Scott S. Balber, Maureen C. Weiss, of counsel), for Donaldson, Lufkin & Jenrette Securities.

Fried, Frank, Harris, Shriver & Jacobson, New York City (William McGuinness, David M. Morris, Albert Shemmy Mishaan, of counsel), for Bear Stearns & Co., Inc.

Cleary, Gottlieb, Steen & Hamilton, New York City (Thomas J. Moloney, Mitchell A. Lowenthal, Robin A. Henry, Carmine D. Boccuzzi, Jr., of counsel), for Kidder, Peabody & Co., Inc.

Gage Buschmann & Palvis, New York City (Alfred U. Pavlis, of counsel), for Geoffrey Bradshaw–Mack.

Berlack, Israels & Liberman, New York City (Steven E. Greenbaum, of counsel), for ABF Capital Management, et al.

Litigation Advisory Board, New York City (Harold D. Jones, Member of the Litigation Advisory Board).

## OPINION

SWEET, District Judge.

In this putative class action alleging securities fraud and related claims, Defendants David J. Askin ("Askin") and Askin Capital

Management, L.P. ("ACM") (collectively, the "ACM Defendants"); Geoffrey S. Bradshaw–Mack ("Bradshaw–Mack"); and Kidder, Peabody & Co., Inc. ("Kidder"), Bear, Stearns & Co., Inc. ("Bear Stearns"), and Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ") (collectively, the "Broker Defendants"), have moved to dismiss the claims set out in the Third Amended Complaint of Plaintiff, Primavera Familienstiftung ("Primavera"), pursuant to Federal Rule of Civil Procedure 9(b) for failure to plead fraud with particularity and pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

Primavera has moved pursuant to Federal Rule of Civil Procedure 42(a) to consolidate this action with a related pending action, styled *ABF Capital Management v. Askin Capital Management, L.P.*, No. 96 Civ. 2678 (S.D.N.Y.) (the "ABF Action").

For the reasons set forth below, the motions of the ACM and Broker Defendants to dismiss the complaint will be denied, Bradshaw–Mack's motion to dismiss will be granted, and Primavera's motion to consolidate for pretrial purposes will be granted.

### The Parties

Primavera is a Liechtenstein Foundation. It proposes to sue on behalf of itself and all others similarly situated.

At all times relevant to this action, ACM, a Delaware limited partnership, was a registered investment adviser, whose exclusive place of business was New York City. Askin is the Chief Executive Officer of ACM. Bradshaw–Mack was at all relevant times ACM's Director of Marketing.

Kidder, Bear Stearns, and DLJ, all Delaware corporations with their principal places of business in New York City, are broker-dealers.

Non-parties Granite Partners L.P. ("Granite Partners"), registered in the State of Delaware, Granite Corporation ("Granite Corp."), incorporated in the Cayman Islands, and Quartz Hedge Fund ("Quartz"), incorporated in the Cayman Islands (collectively, the "Funds"), are investment funds established and managed by Askin. ACM is the investment adviser of the Funds.

### Prior Proceedings

The facts and prior proceedings in this action are set forth in the Court's prior opinions in this matter. *Primavera Familienstiftung v. Askin*, No. 95 Civ. 8905, 1996 WL 494904 (S.D.N.Y. Aug. 30, 1996) ("*Primavera I*"); *Primavera Familienstiftung v. Askin*, 1996 WL 580917 (S.D.N.Y. Oct. 9, 1996) ("*Primavera II*"). The proceedings in the related ABF Action are set forth in the opinion of January 24, 1997. *ABF Capital Management v. Askin Capital Management, L.P.*, 957 F.Supp. 1308 (S.D.N.Y.1997). Familiarity with the prior opinions of this Court is assumed.

Primavera initially filed this action in the United States District Court for the Northern District of California against the ACM Defendants and Bradshaw–Mack on March 24, 1995. The initial complaint was first amended on May 10, 1995. On or about September 20, 1995, Primavera again amended its complaint to add the Broker Defendants.

The case was transferred to this Court on October 18, 1996, and assigned here based on its relation to *Kidder. Peabody & Co. v. Unigestion International, Ltd.*, 903 F.Supp. 479 (S.D.N.Y.1995).

In an opinion dated August 22, 1996, the Defendants' motions to dismiss were granted, with leave granted to Primavera to replead the federal securities law claims and common law fraud claims that had been dismissed for failure to plead fraud with particularity. *Primavera I*, 1996 WL 494904. The ACM Defendants' motion to reargue was granted and the Section 20(a) claim for control person liability was dismissed by an opinion dated October 9, 1996. *Primavera II*, 1996 WL 580197.

Primavera filed the Third Amended Complaint on November 8, 1996. In the complaint, Primavera asserts claims for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (Count One, against ACM, Askin and Bradshaw–Mack), violation of Section 20(a) of the 1934 Act (Count Two, against ACM

and Askin), common law fraud (Count Three, against ACM, Askin and Bradshaw–Mack), and aiding and abetting common law fraud (Count Four, against the Broker Defendants).

The instant motions to dismiss were filed on December 20, 1996. Oral argument was heard on March 26, 1997.

### The Factual Allegations Of the Complaint

On a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P., the facts of the complaint are presumed to be true, and all factual inferences are drawn in the plaintiff's favor. *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). Therefore, the facts set forth here are drawn from the allegations made by Primavera in its Third Amended Complaint (the "Complaint") and do not constitute findings of fact by the Court.

Primavera alleges a fraudulent scheme involving the offer and sale of securities in Granite Partners, Granite Corp. and Quartz. The Funds were engaged in the business of trading derivative securities, primarily mortgage-backed securities, including Collateralized Mortgage Obligations ("CMOs").

According to the Private Placement Memoranda for the Funds, mortgage-backed securities are securities that are backed by mortgage loans secured by real property, principally residential home mortgages. These securities take several basic forms. Pass through securities represent undivided interests in a pool of underlying mortgages. When borrowers pay interest and repay principal on the underlying loans, these payments are passed through to investors. When interest rates decline, borrowers refinance their mortgages with money borrowed at a lower rate and pre-pay principal. While this prepayment of principal is passed through to investors, the prepaid principal must be invested in a market in which interest rates, and thus returns on investment, have declined.

CMOs are debt instruments secured by collateral in the form of whole loans or pass-throughs. The sponsor of a CMO offering purchases a pool of mortgage assets and deposits them in a trust. The trust then issues debt securities and equity interests.

Another type of mortgage-backed instrument is a "Stripped Mortgage–Backed Security." These are derivative securities that are structured with two or more classes (or "tranches") that receive different proportions of the interest and principal distributions from the underlying pool of mortgages (or pool of mortgage-backed securities). For example, one class might receive some of the interest and most of the principal, while another class receives most of the interest and some of the principal. In some cases, one tranche receives interest only, while another tranche receives principal only. By varying the proportion of interest and principal allocated to a given tranche, the creator of these securities seek to allocate the risk of interest rate fluctuations.

Primavera alleges that the ACM Defendants fraudulently induced it and other members of the class to invest in the Funds by misrepresenting and/or omitting to disclose material facts about the investments made or to be made by the Granite Funds. In essence, Primavera contends that Bradshaw–Mack and the ACM Defendants repeatedly misrepresented or omitted to state material facts concerning: (a) ACM's "risk balanced," "market neutral" (as to Granite and Granite Corp.) and "market directional" (as to Quartz) investment strategies, whereby ACM claimed it identified high-quality and attractive risk-offsetting mortgage related securities through a sophisticated computer analysis of each security; (b) the rates of return for the Funds (purportedly 15% to 25%); and (c) ACM's ability to maintain the Funds' leverage ratios at appropriately low and reasonable levels.

The Complaint alleges that the ACM Defendants knew or were reckless in not knowing that the securities purchased by the Funds were not "risk balanced," "market neutral," or, with respect to Quartz, appropriately "market directional," but instead contained primarily bullish and toxic securities, which were highly sensitive to any increases in interest rates and were not appropriately offset by bearish securities. ACM and Askin allegedly eschewed bearish securities for bullish instruments, contrary to ACM's representations that it employed a

proven strategy to purchase and balance off-setting "bullish" and "bearish" securities.

The Complaint alleges that beginning in August 1992, DLJ began performing portfolio analyses of the Funds, at which time it informed the ACM Defendants of Granite Corp.'s "stubbornly high" effective "duration." [1] DLJ continued its review of the Funds' duration throughout the Class Period, noting the large increases in duration and the bullish tilt of all the Funds' portfolios. Moreover, ACM's vice president and co-portfolio manager admitted to UBS Securities that ACM did not know the portfolio's duration and had no way of determining it.

Plaintiff also alleges that by late 1993, each of the Broker Defendants had expressed their concerns to ACM representatives that the Funds would lose significant value if interest rates increased. Primavera alleges that ACM nonetheless continued to purchase securities which caused the Funds to tilt in a dangerously bullish direction, without purchasing appropriately offsetting bearish securities. By the end of February 1994, 92% of Granite Corp.'s portfolio and 94% of Granite Partners's portfolio were invested in bullish or "potentially bullish" securities, contrary to the ACM Defendants' representations about hedging against interest rate fluctuations by balancing the portfolios.

The Complaint also alleges that the offering and marketing materials for the Funds contained assertions of ACM's and Askin's expertise in implementing their "market neutral" strategy through the use of sophisticated proprietary computer models. ACM represented that the models enabled them to identify the market behaviors of the securities purchased by the Funds, including prepayment expectations across a variety of interest rate scenarios. Compl. ¶ 56. It is alleged that there were no proprietary models in existence, and that the computer programs used by ACM and Askin were generally available to the public.

The Complaint also states that the ACM Defendants knew that the impressive rates of return represented to investors were not based on the purported systematic and proven trading strategy, but rather were based on inflated and manipulated valuations of securities or "dealer" marks. The Complaint alleges that the Broker Defendants knowingly provided inflated dealer marks or valuations to ACM and Askin and that Askin occasionally disagreed with marks provided by the dealers, and renegotiated "smoothed" marks to more favorably present the Funds' performance to investors and potential investors. These inflated marks were used by the ACM Defendants in monthly "flash" reports with the Broker Defendants' knowledge, which updated investors on the Funds' performance. An ACM representative allegedly informed a Bear Stearns salesman that ACM was pleased that it did not have to report the accurate and more volatile returns, and that "investors were happy" about the "smoothed marks." These "smoothed," manipulated marks allegedly enabled the ACM Defendants to induce existing clients to invest in other Granite Funds, including Quartz.

In addition, ACM and Askin allegedly manipulated the marks in March 1994, without the approval of the Brokers. Because of rising interest rates, the value of the Funds' portfolios plummeted. The Broker Defendants' dealer marks showed that the net asset value of the Funds had declined in excess of 20% by March 1994. Askin allegedly sought, as he had in the past, to negotiate more favorable marks, but was unable to do so because the Broker ' Defendants were faced with their own market pressures related to the interest rate increase. Therefore, rather than utilizing dealer marks, Askin substituted his own manager marks, which showed the value of the Funds had declined only 1–2%. Askin allegedly knew that these marks would be more consistent with his "market neutrality" representations and would attract more investors, who would be impressed with his trading acumen in volatile market conditions. Only on the eve of the Funds' collapse did Askin finally inform Pri-

1. Duration is a measure of the market-neutrality or interest-rate sensitivity of a security or a portfolio of securities. A duration of zero indicates market neutrality, while a positive duration indicates that the security is "bullish," *i.e.,* that its value falls when interest rates rise and rises when interest rates fall.

mavera and members of the class that the Funds had lost 20% of their value in February 1994.

It is also alleged that the ACM Defendants knew that the Funds were over-leveraged. Primavera alleges that the Funds were leveraged beyond the purportedly safe levels represented to investors and that ACM's Investment Advisory Committee repeatedly warned ACM and Askin of the increasingly high leverage ratios. Primavera contends that had ACM and Askin stayed within their represented leverage ratios, the Funds' rate of return would not have been so impressive, since a significant part of the Funds' purchases were made with borrowed funds.

Primavera also describes a variety of incentives that allegedly motivated ACM and Askin to perpetrate the fraud charged in the Complaint. The Complaint alleges that by providing investors with inflated marks, ACM and Askin were able to obtain additional investments to further leverage the Funds' portfolios through the use of margin and repurchase agreements, by which ACM and Askin could further increase the Funds w potential returns. Exaggerated rates of return allegedly boosted the Funds' performance and ACMIs and Askin's fees. The Complaint describes ACMIs compensation structure as being tied to the overall amount of monies in the Funds. ACM also received an incentive fee for 20% of all profits exceeding its targeted rate of return, thereby providing an incentive beyond the receipt of advisory fees to generate high rates of return.

With respect to the Broker Defendants, the Complaint alleges that during late 1993, in exchange for ACMIs promise to deliver additional business, Kidder paid the monthly fees owed by ACM to an outside computer consultant ACM had engaged to calculate the Funds' cash flow yield. Moreover, the values of the Funds' securities were on occasion arrived at by negotiation among ACM, Askin and the Broker Defendants. Primavera contends that these allegations demonstrate that the Brokers knew that ACM was not using sophisticated proprietary computer models to manage the Funds' portfolios.

In addition, with knowledge of the representations concerning the Funds' "market neutral," "risk balanced" strategy, each of the Broker Defendants is alleged to have expressed concerns about the Funds' increasingly bullish tilt, but continued to sell volatile and bullish securities to the Funds without appropriate offsetting bearish securities and continued to supply inflated performance marks that were passed on to investors and potential investors. This continued into 1994, even after interest rates began increasing in early 1994, and even as the Broker Defendants continued to advise the ACM Defendants of the dangerously bullish tilt of the Funds.

It is further alleged that the Broker Defendants knew that the Funds' reported returns were not based on the Funds' actual performance, but were instead the result of manipulation in which they participated. The Complaint alleges that the Broker Defendants negotiated with the ACM Defendants to arrive at artificially inflated and "smoothed" dealer marks, which were reported to Primavera and the class. Even when they knew that the securities were not accurately valued, the Broker Defendants acceded to Askin's demands for inflated dealer marks for purposes of reporting to investors.

The Broker Defendants also allegedly created special financing accommodations to ACM which they did not extend to other clients. By providing these special privileges and, in the case of Kidder, violating its own internal credit policy, the Broker Defendants allegedly enabled the Funds to purchase hundreds of millions of dollars of securities on credit. The Broker Defendants allegedly knew of the Funds' dangerous margin deficits and knew that, by extending credit to Askin and ACM, they could continue selling their most volatile classes of mortgage-backed derivatives.

The Broker Defendants allegedly were motivated to participate actively in the fraudulent scheme, since the sale of high risk derivative CMOs to the Funds was critical to the Broker Defendants' ability to expand their share of the broader, less risky CMO market. The Broker Defendants allegedly faced exceptional pressures to sell the high-risk de-

rivatives because of the structure of their mortgage-backed securities offerings. CMOs generally consist of fixed income securities created from underlying collateral pools of residential mortgages. While these mortgages generate cash flow from a combination of principal and interest payments, CMOs are created by dividing the income stream from a single pool of mortgages into discreet components with varying mixes of interest and principal. Each security generates income based upon its mix of principal and interest payments. Thus, through the creation of these instruments, brokers can allocate the risks associated with interest rate fluctuations. For example, in periods of declining interest rates, CMOs linked primarily or exclusively to principal repayments tend to increase in value, as homeowners prepay outstanding principal by refinancing their mortgages at the lower market rates. Conversely, CMOs linked to interest payments tend to increase in value during times of rising interest rates, when homeowners are less likely to refinance their mortgages. In creating separate tranches or classes of instruments, however, brokers must account for each component of the underlying mortgage collateral pool. Thus, a broker cannot create a tranche of CMOs derived from the "low-risk" elements of the underlying mortgages without also creating an offsetting tranche that accounts for the higher risk elements of the collateral pool.

The Broker Defendants were allegedly motivated to participate in the fraudulent scheme described in the Complaint by their need for a purchaser of the high-risk CMO tranches. Specifically, the interrelatedness of the underlying collateral pool precluded the Broker Defendants from completing any offering of CMOs until they sold all tranches of securities derived from the pool, including the most high-risk, undesirable tranches. Without an outlet for these securities, the Broker Defendants could not market their less volatile tranches since they were unwilling to purchase the high risk, "toxic" tranches themselves due to the extreme risk of loss associated with these instruments. Thus, only by finding an outside purchaser for these virtually unmarketable securities could

the Broker Defendants secure their position in the broader CMO market.

The Funds allegedly provided the means by which the Broker Defendants could achieve their goal. The Funds' willingness to purchase the most "toxic" tranches of derivative securities allowed the Broker Defendants to sell less risky instruments to other customers and thereby substantially increase their share of the CMO market. Further, the Broker Defendants are alleged to have attempted to ensure that the Funds would continue to purchase these otherwise unmarketable instruments by providing artificially inflated estimates of their value to the ACM Defendants, thereby providing the basis for the false and misleading representations issued to investors concerning the performance of the Funds. The Broker Defendants also extended excessive credit to ACM and offered special accommodations to ACM so that the Funds would continue purchasing their most "toxic" tranches.

In addition, the Broker Defendants are alleged to have received compensation, as much as 128 times the amount earned from selling non-deal driving tranches, on the sale of these "deal-driving" classes of securities. Moreover, the Broker Defendants materially increased their market share in the lucrative CMO market, largely due to their sale of these volatile securities to the Funds.

## Discussion

### I. The Notions to Dismiss

The principal issues raised by the motions to dismiss are: (1) whether Primavera has adequately alleged Bradshaw–Mack's and the ACM Defendants' scienter; (2) whether Primavera has stated a claim for aiding and abetting common law fraud and alleged such a claim with adequate particularity against the Broker Defendants; and (3) whether plaintiff·has adequately alleged that ACM and Askin were control persons of the Funds.

### A. Legal Standards

#### 1. Legal Standard for Rule 12(b)(6)

Rule 12(b)(6) imposes a substantial burden of proof upon the moving party. A court may not dismiss a complaint unless the mov-

ant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *H.J. Inc. v. Northwestern Bell Tel., Co.,* 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2905–06, 106 L.Ed.2d 195 (1989); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

### 2. Legal Standards for Rule 9(b)

Federal Rule of Civil Procedure 9(b) requires that in all allegations of fraud, the circumstances constituting the fraud must be stated with particularity. *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127 (2d Cir.1994); *In re Time Warner Inc. Secs. Litig.,* 9 F.3d 259, 265 (2d Cir.1993), *cert. denied,* 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994); *Shemtob v. Shearson, Hammill & Co.,* 448 F.2d 442, 444–45 (2d Cir.1971). The pleading must be sufficiently particular to serve the three goals of Rule 9(b) which are (1) to provide a defendant with fair notice of the claims against it; (2) to protect a defendant from harm to his reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits. *See DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir. 1987); *O'Brien v. Price Waterhouse,* 740 F.Supp. 276, 279 (S.D.N.Y.1990), *aff'd,* 936 F.2d 674 (2d Cir.1991).

Allegations of fraud generally must specifically identify the statements that were false or misleading, explain how it is contended that the statements were fraudulent, and state the time and place the statements were made and the identity of the person who made them. *See McLaughlin v. Anderson,* 962 F.2d 187, 191 (2d Cir.1992); *Cosmas,* 886 F.2d at 11.

### B. The ACM Defendants' Motion to Dismiss for Failure to Plead Fraud With Particularity

ACM and Askin contend that the Complaint fails to allege with sufficient particularity the scienter element of the federal securities and common law fraud claims.

■ The pleading standards for the scienter element of a fraud claim are not as stringent as those for the other elements of such a claim. Rule 9(b) provides that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." *See Shields,* 25 F.3d at 1128. The Court of Appeals has held that "allegations of scienter ... are not subjected to the more exacting consideration applied to the other components of fraud." *Breard v. Sachnoff & Weaver, Ltd.,* 941 F.2d 142, 143 (2d Cir.1991) (*quoting Ouaknine v. MacFarlane,* 897 F.2d 75, 81 (2d Cir.1990)). All that is required under Rule 9(b) is that there exist a "minimal factual basis for ... conclusory allegations of scienter." *Cohen v. Koenig,* 25 F.3d 1168, 1173 (2d Cir.1994) (*quoting Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987)). "In fact, conclusory allegations of scienter are sufficient 'if supported by facts giving rise to a "strong inference" of fraudulent intent.'" *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1057 (2d Cir. 1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994). (*quoting Ouaknine,* 897 F.2d at 80). There are two independent ways to give rise to such an inference. A plaintiff may either (1) identify circumstances indicating conscious or reckless misbehavior by the defendants, or (2) allege facts showing both a motive for committing fraud and a clear opportunity for doing so. *Shields,* 25 F.3d at 1128; *Cosmas,* 886 F.2d at 13; *Powers v. British Vita. P.L.C.,* 57 F.3d 176, 184 (2d Cir.1995). When relying on circumstances indicating conscious misbehavior, the strength of the circumstantial evidence generally must be greater. *Powers,* 57 F.3d at 184.

There is no dispute that ACM, as the fund manager making investment decisions and producing the allegedly fraudulent marketing and private placement materials, had a clear opportunity to defraud the plaintiffs. *See Jaquith v. Newhard,* No. 91 Civ. 7503, 1993 WL 127212, *7 (S.D.N.Y. Apr. 20, 1993) (defendant, as president of company, had clear opportunity to misrepresent company's value to fraudulently induce loan from plaintiff)

■ With respect to motive, Primavera alleges that ACM was paid fees based on a

percentage of the dollar amount invested in the funds it managed and also received a percentage of profits in excess of its target rates of return. This fee structure allegedly gave ACM a motive to misrepresent its fund management strategy and methods and to overstate the Funds' performance, both to attract investments and to reap higher fees on the inflated profits.

■ Although the desire to enhance income may motivate a person to commit fraud, allegations that a defendant stands to gain economically from fraud do not satisfy the heightened pleading requirements of Rule 9(b). *See Shields,* 25 F.3d at 1130; *see also Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995) (compensation based on stock value does not give rise to strong inference of scienter in claim that defendant delayed reporting drop in stock price). "On a practical level, were the opposite true, the executives of virtually every corporation in the United States could be subject to fraud allegations." *Shields,* 25 F.3d at 1130. Because Primavera identifies no other motivation for ACM's alleged fraud, the Complaint does not adequately allege a motive for fraud.

■ Primavera does, however, sufficiently allege circumstances indicative of conscious misbehavior. Askin and ACM claimed that they used sophisticated, proprietary, quantitative analytical methods to model the behavior of highly esoteric CMO derivatives. Specifically, marketing materials for Granite described a proprietary five-step process that could purportedly assess prepayment expectations on the underlying mortgages in a variety of interest rate scenarios. Primavera alleges that ACM never had or used its own proprietary analytical models, but relied solely on commonly available computer programs.

The following allegations support a strong inference that the misrepresentations about the computer models were made with scienter. Primavera alleges that ACM officers admitted to a third party that they did not know the duration of their portfolios and had

"no way of finding out." A fund manager that admits to having no way of determining the duration of its portfolios is likely to know it does not have computer analytics capable of calculating cash flow and duration. Moreover, ACM hired an outside firm to calculate the Funds' cash flow yield, suggesting that ACM knew it could not model the market behavior of its portfolios with its own touted proprietary models.

While these allegations do not necessarily give rise to an inference that ACM intentionally engaged in a bullish investment strategy, *see Primavera,* 1996 WL 494904, at *21, they do give rise to an inference that ACM knew at the time they made representations about their methods for evaluating securities that they did not have the analytical capacities they claimed to have. Valuing CMOs is "an art, not a science." *Id.* Here, ACM is alleged to have represented that it had reduced the art of valuing and modeling CMOs to a "proprietary, quantitative" science, when in fact it was relying on intuition and commonly available software. *See ABF Capital Management v. Askin Capital Management, L.P.,* 957 F.Supp. at 1327.

The ACM Defendants respond that the allegations relating to the purportedly proprietary analytical methods amount to no more than a claim of mismanagement or breach of fiduciary duty, a claim that belongs not to individual shareholders, but to the corporation. *See Primavera I,* 1996 WL 494904, at *15 ("Claims based on corporate mismanagement or third party action that resulted in the diminution of share value belong to the corporation and can only be brought by it."); *In re Granite Partners, L.P.,* 194 B.R. 318, 327 (Bkrtcy.S.D.N.Y. 1996). They note that the Complaint itself concedes that ACM used computer software to assess securities and alleges not that ACM did not analyze the securities, but merely that the analysis was inadequate. However, the essence of the misrepresentation here is that ACM falsely claimed that it had "proprietary" models, that is, its own sophisticated computer analytics that were unavailable to other fund managers.[2]

---

**2.** Taking the allegations regarding the computer analytics as true and drawing all inferences in

favor of the plaintiff, the misrepresentations could reasonably induce a person who might

Moreover, the allegation that ACM negotiated marks upward with the Broker Defendants supports a strong inference that ACM knew that the fund performance it reported to investors and potential investors was fabricated. Although ACM contends that the substitution of manager marks for the Dealer's lower marks in March 1994 occurred only after Primavera purchased its securities, and thus those marks could not have been relied upon by Primavera in making its purchase, this allegation, by demonstrating ACM's willingness to manipulate marks, further supports an inference that ACM willfully reported the earlier negotiated valuations knowing they were fictitious.

In sum, Primavera has sufficiently alleged the ACM Defendants' scienter.[3] Accordingly, the ACM Defendants' motion to dismiss the federal securities claims and the common law fraud claim will be denied.

## C. *Bradshay-Mack's Motion to Dismiss for Failure to Plead Scienter With Particularity*

Primavera concedes that it does not adequately allege that Bradshaw–Mack had a motive to participate in the fraud. Accordingly, to satisfy the requirements of Rule 9(b), Primavera must allege circumstances indicating conscious or reckless misbehavior. *Shields*, 25 F.3d at 1128. When relying on circumstances indicating conscious misbehavior, the strength of the circumstantial evidence generally must be greater. *Powers*, 57 F.3d at 184.

■ The Complaint does not allege facts from which a strong inference of knowledge or recklessness as to the truth can be drawn. Bradshaw–Mack was Director of Marketing and there are no allegations that he was involved in trading or portfolio management. Primavera points to several paragraphs of the Complaint it contends support an inference that Bradshaw–Mack was aware he was misrepresenting ACM's trading strategy, methods and leverage. See ¶¶ 63, 83, 90–91. However, paragraph 63 refers to the admission by ACM's co-portfolio manager that ACM never knew the duration of its portfolios. This allegation provides no basis for inferring that Bradshaw–Mack, the Director of Marketing, was aware of ACM's inability to model the securities it purchased. Paragraphs 90–91 allege that Bradshaw–Mack misrepresented the Funds' leverage ratios, but they contain nothing more than concluso-

---

otherwise not invest in potentially-risky mortgage-backed securities funds to make such an investment through ACM. *Compare Kagan v. Edison Bros. Stores, Inc.*, 907 F.2d 690, 692 (7th Cir.1990) (no direct injury where plaintiffs did not contend that but for misrepresentation they would have acted differently with respect to sale of stock).

3. The ACM Defendants also urge reconsideration of this Court's holding in *Primavera I* that the bespeaks caution doctrine does not apply here because the doctrine does not protect material misrepresentations of present or historical fact, such as the alleged representations concerning computer analytics, as opposed to representations of future plans or strategy. *See Primavera I*, 1996 WL 494904 at *9; *see also In re Regeneron Pharmaceuticals Sec. Litig.*, No. 94 Civ. 1785, 1995 WL 228336 at *5 (S.D.N.Y. March 10, 1995); *Gray v. First Winthrop Corp.*, 82 F.3d 877, 883 (9th Cir.1996). They contend that reconsideration is appropriate in light of the Second Circuit's recent decision in *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir.1996). *Olkey* held that where alleged misrepresentations of an investment fund's risk-management strategy (in the prospectus or in oral statements) are contradicted by clear warnings of the risks in the

prospectus, no claim of securities fraud is stated. *Id.* at 7–9 (claim based on failure to disclose fund's bias in favor of securities that perform well when interest rates rise dismissed where prospectus clearly communicated this bias).

Here, however, the alleged misrepresentations about the existence of computer analytics and the performance of the fund are not contradicted by the offering materials' disclosure of the inherent risks of the securities in the Funds' portfolios. Indeed, the PPMs stated that ACM "uses computer models to project the investment performance of different Mortgage–Backed Securities under different interest-rate scenarios" and that the "models used to offset risks have been carefully constructed and researched ..." *Granite Corp. PPM* at 11–12, 15. These statements reinforce the allegedly false claim that ACM made to having unusual computer capabilities. Accordingly, the Complaint will not be dismissed entirely under the bespeaks caution doctrine.

However, any allegation of oral representations that the Funds would purchase only securities that were individually low-risk and would maintain leverage ratios lower than those specified in the offering materials are expressly contradicted by the PPMs, and thus do not support a fraud claim.

ry assertions that Bradshaw–Mack made these allegations knowingly or recklessly. There are no allegations that Bradshaw–Mack was informed of or had reason to know of the actual leverage ratios of the Funds.

Paragraph 83 alleges that either Bradshaw–Mack or Richard John, or both of them, had communications with Bear Stearns about the "smoothed" (*i.e.*, negotiated) marks that were used to represent the performance of the Funds to prospective investors. Such an equivocal allegation, which fails to differentiate the actions of the defendant from a non-party, is insufficient to give rise to a strong inference of Bradshaw–Mack's scienter, particularly in light of the absence of any other allegations indicative of knowledge or recklessness. A fraud claim may not rely upon vague allegations of conduct that clump individuals together. *In re Blech Securities Litigation*, 928 F.Supp. 1279, 1294 (S.D.N.Y. 1996). This prohibition on vague clumping protects a potentially innocent party's reputation from groundless accusations, *see de Atucha v. Hunt*, 128 F.R.D. 187, 189 (S.D.N.Y.1989), *aff'd*, 979 F.2d 846 (2d Cir. 1992), and serves to prevent abuse of process. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 740–41, 95 S.Ct. 1917, 1927–28, 44 L.Ed.2d 539 (1975). Were such "either/or" allegations permitted against individual employees of a corporate defendant, virtually all employees could be indiscriminately swept into the discovery stage of litigation.

■ Accordingly, Bradshaw–Mack's motion to dismiss will be granted. Because Primavera has twice tried and failed to allege fraud with particularity against Bradshaw–Mack, leave to replead will not be granted at this time. Under Federal Rule of Civil Procedure 15(a), a party is entitled to one amendment of its pleading as a matter of course. F.R.C.P. 15(a). Where, as here, a Rule 15(a) repleading has been undertaken, it is within the discretion of the district court to allow or deny repleading, and a court should refuse repleading if it would be futile. *In re American Express Co. Shareholder Litigation*, 39 F.3d 395, 402 (2d Cir.1994).

The present Complaint represents Primavera's second failed attempt to state a claim against Bradshaw–Mack. Allowing the Plaintiffs an opportunity to replead against Bradshaw–Mack would be futile at this time.

### D. *The Broker Defendants' Motion to Dismiss*

#### 1. *Failure to State a Claim*

■ To state a claim for aiding and abetting fraud under New York common law, a plaintiff must allege: (1) the existence of a primary fraud; (2) the aider and abettor's knowledge of the fraud; and (3) substantial assistance provided by the aider and abettor. *See In re JWP Inc. Securities Litigation*, 928 F.Supp. 1239, 1258 (S.D.N.Y.1996); *ABF*, 957 F.Supp. at 1328. The Broker Defendants contend that Primavera has failed to allege that their conduct substantially assisted the fraud perpetrated by ACM.

The substantial assistance element has been construed as a causation concept, requiring that the plaintiff allege that the acts of the aider and abettor proximately caused the harm upon which the primary liability is predicated. *See Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*, 602 F.2d 478, 484 (2d Cir.1979) (substantial assistance is proximate causation concept), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980); *Northwestern Nat'l Ins. Co. v. Alberts*, 769 F.Supp. 498, 511 (S.D.N.Y.1991) ("plaintiff alleging 'substantial assistance' by the aider and abettor must allege that the acts of the aider and abettor proximately caused the harm upon which the primary liability is predicated.").

■ The Brokers contend that their alleged actions did not proximately cause Primavera's injury because Primavera alleges that, in purchasing shares in the Funds, it relied upon the inflated manager marks for February 1994 that ACM substituted for the Brokers' accurate marks. Since the Brokers allegedly refused to negotiate these particular marks upward, they contend they cannot be held to have substantially assisted in making the misrepresentation that caused Primavera to invest.

However, Primavera does not allege that it relied solely upon the manager marks for the month of February 1994 in making its deci-

sion to invest. Paragraph 109, to which the Broker Defendants point, states that Primavera acted in reliance on the Defendants' representations, and that had the truth about the Funds been revealed it would not have invested. While the fact that the Funds had lost substantial value in February 1994 is included among the facts that should have been revealed, other allegations, when construed in Primavera's favor, indicate that Primavera also relied on the reported prior performance of the fund, which was based in part on the marks which the Broker Defendants assisted in manipulating. The Complaint does not allege that had ACM reported the Brokers' marks for February 1994, it would not have invested, even if the prior volatile marks had been reported directly, rather than "smoothed" with cooperation of the Brokers. The fact that Primavera may have alleged reliance upon a misrepresentation of fund performance which the Brokers did not substantially assist does not necessarily negate the more general allegation of reliance on previous misrepresentations in which the Brokers did participate. See ¶ 72 (alleging that Broker Defendants provided ACM with inflated valuations of securities, which were then passed on to customers); ¶¶ 83–84 (alleging Brokers' renegotiated marks to make valuation results as favorable as possible to induce new investors with inflated performance reports).[4]

As the Broker Defendants note, the Private Placement Memoranda granted ACM the ultimate authority to determine the values of the securities in the Funds' portfolios, and thus the Brokers had no obligation to second-guess ACM or report its disagreements to investors. However, the willingness of the Brokers to accommodate ACM's requests for upward adjustments still substantially assisted ACM in promulgating false performance reports by making it possible for ACM to claim that the reports were based on objective valuations.

Thus, drawing all inferences in Primavera's favor, the Complaint adequately alleges substantial assistance.

### 2. *Failure to Plead Scienter with Particularity*

 To adequately plead scienter in an aiding and abetting fraud claim, a plaintiff must allege sufficient facts to support a "strong inference" of fraudulent intent. *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987); *Dreieck Finanz AG v. Sun*, No. 89 Civ. 4347, 1990 WL 11537, at *12 (S.D.N.Y. Feb. 9, 1990). Plaintiffs may raise such an inference in one of two ways: (1) by alleging facts showing a motive for participating in a fraudulent scheme and a clear opportunity to do so; or (2) by identifying circumstances indicative of conscious behavior. *Dreieck*, 1990 WL 11537 at *12. Plaintiffs have alleged both "motive and opportunity" and circumstances indicative of conscious behavior.[5]

 Primavera has alleged a powerful motivation for the Brokers' participation in the fraudulent scheme. Ordinary economic motives are insufficient to support the scien-

---

**4.** It is arguable that it would be unreasonable to invest in a Fund that showed a 20% decline prior to the investment. However, the reasonableness of reliance is ordinarily a factual question inappropriate for resolution at the pleadings stage, at least with respect to the common law fraud claims. *See, e.g., City of Amsterdam v. Daniel Goldreyer, Ltd.*, 882 F.Supp. 1273, 1281–82 (E.D.N.Y.1995); *Whitbread (US) Holdings, Inc. v. Baron Philippe de Rothschild, S.A.*, 630 F.Supp. 972, 978 (S.D.N.Y.1986); *In re Argo Communications Corp.*, 134 B.R. 776, 793 (Bankr.S.D.N.Y. 1991); *Country World v. Imperial Frozen Foods Co.*, 186 A.D.2d 781, 782, 589 N.Y.S.2d 81, 82 (2d Dep't 1992). An investor might conclude that the February 1994 loss was a temporary setback the Funds could overcome, given the appearance of prior stability created by the inflating and smoothing of marks that the Brokers'

facilitated and given ACM's representations about its analytic capabilities.

**5.** It is appropriate in some circumstances to apply more exacting scrutiny to allegations of scienter against an aider and abettor than would be applied to allegations against the primary perpetrator, since the "scienter requirement scales upward when activity is more remote" *Edwards & Hanly*, 602 F.2d at 484; *National Westminster Bank USA v. Weksel*, 124 A.D.2d 144, 511 N.Y.S.2d 626, 630 (N.Y.App.Div. 1st Dep't), *appeal denied*, 70 N.Y.2d 604, 519 N.Y.S.2d 1027, 513 N.E.2d 1307 (1987). The Complaint here, however, alleges a symbiotic fraudulent scheme between ACM and the Brokers, not a "remote" relationship. In these circumstances, the scienter requirement need not be more exacting than that applied to the primary fraud.

ter element of an aiding and abetting claim. *See Shields,* 25 F.3d at 1130. Here, however, the Brokers' "economic motives" were extraordinary. They allegedly earned extremely high fees, including special commissions, on the sale of "toxic" securities to ACM. They needed to make these sales to ACM because ACM was one of the few buyers of these risky instruments, and their sale was essential to making a profit on any given CMO offering. The Brokers needed ACM to continue purchasing these securities to perpetuate and expand the Brokers' market for CMOs. ACM would not have been able to continue purchasing these instruments if the investors had been told the truth about them, so the Brokers had a motive to assist in the perpetration of the fraud. Such allegations of motive are sufficient to infer not only knowledge of fraud, but an intent that the fraud continue.

Moreover, Plaintiffs allege circumstances indicative of conscious misbehavior. Plaintiffs allege that each Broker knowingly provided inflated marks to ACM, increasing original valuations after negotiation, to allow ACM to report false valuations and returns to its investors. This allegation of negotiation strongly suggests that the Brokers knew the marks were fictional. It also suggests that the Brokers knew that any purported "quantitative" model for analyzing the securities was fictional.

The Broker Defendants contend, however, that the allegations of the Complaint directly contradict any inference that they acted with scienter. Specifically, they contend that Primavera's allegation that the Brokers refused to negotiate the February 1994 marks upward negates any inference of scienter.

However, the fact that the Brokers did not assist in one misrepresentation does not negate an inference that the Brokers knowingly assisted in the previous misrepresentations. Primavera alleges that the Brokers assisted the fraudulent scheme so long as their interests coincided with those of ACM, but that once their interests diverged as a result of changing market conditions, the Brokers protected their own interests by refusing to negotiate marks upward. This ultimate divergence of interests does not negate an inference that the Brokers knowingly assisted ACM in making earlier material misrepresentations about fund performance that were material to Primavera's decision to invest.

The Broker Defendants also contend that the allegations of knowledge and scienter are defective because they do not adequately differentiate one defendant's actions from those of another. However, there are allegations particular to each defendant indicative of awareness of the fraudulent scheme. *See* Compl. ¶ 69 (Kidder salesperson stated Kidder was "in bed with" ACM and did not want to "pull the plug" on ACM's trading activities); ¶ 71 (Kidder paid monthly fees to computer consultant hired by ACM to calculate cash-flow, suggesting Kidder knew ACM's representations about analytical capacity were false); ¶ 76 (DLJ study of Funds' portfolios show Funds' high positive duration; study distributed to Kidder and Bear Stearns); ¶ 80 (Bear Stearns' review of Funds' portfolios revealed excessive position in particular bullish instrument); ¶ 83 (communications between Bear Stearns and ACM about smoothed marks).

Moreover, the degree of particularity required should be determined in light of the progress of discovery. *See Devaney v. Chester,* 813 F.2d 566, 569 (2d Cir.1987). Where, as here, discovery has not commenced and the complaint is sufficiently detailed to permit a response, the failure to separate allegations of knowledge is not fatal. *See Memphis Housing Auth. v. Paine, Webber Jackson & Curtis, Inc.,* 639 F.Supp. 108, 110–11 (W.D.Tenn.1986) (complaint's failure to itemize the acts of three broker defendants is not fatal where the "allegations are ... sufficient to allow response").

Accordingly the Broker Defendants' motion to dismiss will be denied.

## II. *The Motion to Consolidate*

### A. *Background of the ABF Action*

The ABF Action arises out of the ABF Plaintiffs' aggregate investments of approximately $230 million in the underlying funds at issue in these actions. Among the ABF plaintiffs are ERISA retirement plans, corporations, investment partnerships, and individ-

uals. The ABF Plaintiffs made their investments between 1990 and March 1994.

The ABF Action was commenced in the New York State Supreme Court. The ABF Complaint asserts common law claims, including a fraud cause of action against Askin Capital Management, L.P. ("ACM"), and an aiding and abetting claim against the Broker Defendants.

By Notice of Removal dated April 24, 1996, the ABF Action was removed to the United States District Court for the Southern District of New York and assigned here based on its relatedness to the Primavera Action. Motions to dismiss were made by all of the defendants in the ABF Action. In *ABF*, 957 F.Supp. 1308 (S.D.N.Y.1997), the Court denied in part and granted in part said motions; notably, the fraud claim against ACM and the aiding and abetting claim against the Broker Defendants were upheld by this Court.

All defendants have served answers to the ABF Complaint and discovery has commenced. Specifically, document requests and interrogatories have been served on the ABF Plaintiffs, and the ABF Plaintiffs have served document requests on each of the Broker Defendants. The parties' respective responses to these requests are due in April. The parties anticipate beginning depositions in May or June.

### B. *Discussion*

Rule 42(a) provides that "[w]hen actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all of the matters at issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." Rule 42(a) also permits consolidation for pretrial purposes. *See Katz v. Realty Equities Corp. of New York*, 521 F.2d 1354, 1359 (2d Cir.1975); *Firemen's Ins. Co. of Newark v. Keating*, 753 F.Supp. 1137, 1141 (S.D.N.Y.1990).

A district court has broad discretion to consolidate actions. *International Paving Systems, Inc. v. Van–Tulco, Inc.*, 806 F.Supp. 17, 22 (E.D.N.Y.1992); *Consorti v. Armstrong World Industries, Inc.*, 72 F.3d 1003, 1006 (2d Cir.1995) ("Consolidation is a valuable and important tool of judicial administration."), *vacated on other grounds*, —— U.S. ——, 116 S.Ct. 2576, 135 L.Ed.2d 1091 (1996). However, "the discretion to consolidate is not unfettered" and "[c]onsiderations of convenience and economy must yield to a paramount concern for a fair and impartial trial." *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284–85 (2d Cir.1990), *cert. denied*, 498 U.S. 920, 111 S.Ct. 297, 112 L.Ed.2d 250 (1990); *see also Malcolm v. National Gypsum Co.*, 995 F.2d 346, 350 (2d Cir.1993) ("The benefits of efficiency can never be purchased at the cost of fairness.").

However, so long as any confusion or prejudice does not outweigh efficiency concerns, consolidation will generally be appropriate. *International Paving Systems, Inc. v. Van–Tulco, Inc.*, 806 F.Supp. 17, 22 (E.D.N.Y.1992). "In securities actions where the complaints are based on the same 'public statements and reports' consolidation is appropriate if there are common questions of law and fact" and the parties will not be prejudiced. *Werner v. Satterlee, Stephens, Burke & Burke*, 797 F.Supp. 1196, 1211 (S.D.N.Y.1992) (citations omitted).

It is uncontested that the two actions share common legal and factual issues. Moreover, all parties concede that coordinated discovery is desirable to avoid duplication and waste of time. However, the parties to the ABF action contend that consolidation is inappropriate for several reasons.

First, they contend that litigation of the class certification issues in the Primavera Action will delay the progress of the merits discovery that has already commenced in the ABF Action. However, such delay will occur only if discovery on the merits is stayed pending the class certification motion, and this Court has no intention of staying merits discovery pending the class certification motion, since denial of class certification is not likely to result in withdrawal of Primavera's individual claims because Primavera asserts an individual loss of over one million dollars. *See Moss v. Hollis*, No. Civ. B–90–177, 1990

WL 138531, *1 (D.Conn. June 29, 1990); *see also In re USA Classic Sec. Litig.*, No. 93 Civ. 6667, 1996 WL 104366, * 1 (S.D.N.Y. March 8, 1996) (denying motion to stay merits discovery pending class certification).

The ABF plaintiffs object that consolidation will impair their right to counsel of their choice or adversely affect their procedural or substantive rights. However, consolidation will not affect their right to choose their own counsel or have any substantial impact on their ability to pursue their claims. In *Discount Bank & Trust Co. v. Salomon Inc.*, 141 F.R.D. 42 (S.D.N.Y.1992), the court rejected objections similar to those raised here. In that case, the plaintiff in an individual action objected to the consolidation of its action with a pending class action on the grounds that consolidation would adversely affect its right to choose its own counsel or pursue its procedural and substantive rights and would bind it to settlement negotiations conducted for the class as a whole. *Id.* at 43–44. The Court consolidated the actions over the individual plaintiff's objections, stating:

> Despite its objections, consolidation will neither affect Discount Bank's right to choose its own counsel, nor will it affect substantially its ability to pursue its procedural and substantive rights.... [The pretrial order] consolidates and appoints lead counsel for the class action complaints only. Discount Bank will not be bound by settlement negotiations conducted for the class. It will always have the right to opt out of the class. Consolidation for pretrial purposes will merely require Discount Bank to pursue discovery as arranged by lead counsel in [the class action].

*Id.* at 44.

Similarly, consolidation here will not prejudice the ABF plaintiffs' rights. Consolidation "does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496–97, 53 S.Ct. 721, 727–28, 77 L.Ed. 1331 (1933); *see also Garber v. Randell*, 477 F.2d 711, 716 (2d Cir.1973). Consolidation will not impose Primavera's counsel on the ABF plaintiffs, and the ABF plaintiffs remain free to opt out of the class,

if one is certified, and to pursue their individual actions.

Finally, the ABF plaintiffs express concern that their common law fraud claims will somehow be "tainted" by the federal securities law issues raised by the Primavera Complaint. However, the presence of the federal securities law claims does not weigh heavily against consolidation here. The court in *Discount Bank* consolidated an individual action alleging a RICO claim in addition to securities fraud claims with related securities class actions that did not contain RICO claims. *Discount Bank*, 141 F.R.D. at 44. The court reasoned that consolidation was appropriate where the predicate acts were the same acts alleged in the securities fraud class actions. *Id.* Similarly, the federal securities law claims here are based on essentially the same conduct as alleged in support of the common law claims in the ABF action. Moreover, federal securities law and common law fraud claims share substantial similarities, *see Morse v. Weingarten*, 777 F.Supp. 312, 319 (S.D.N.Y.1991), and differences encountered in pretrial proceedings will be taken into consideration by this Court. The question of consolidation for trial, where the risk of confusion of issues may be greater, is not raised by this motion.

### Conclusion

For the reasons set forth above, the ACM Defendants' and Broker Defendants' motions to dismiss are hereby denied. Bradshaw-Mack's motion to dismiss is hereby granted. Primavera's motion to consolidate for pretrial purposes is hereby granted.

The parties are directed to submit a joint proposed pretrial order to govern the consolidated pretrial proceedings. Primavera is directed to file its motion for class certification within twenty (20) days of the entry of this order.

It is so ordered.