GABRIEL CAPITAL, L.P., a Delaware Limited Partnership, and Ariel Fund Ltd., a Cayman Islands Corporation, Plaintiffs,

v.

NATWEST FINANCE, INC., f/k/a Gleacher Natwest Inc., d/b/a NatWest Capital Markets Limited, and McDonald Investments Inc, f/k/a McDonald & Company Securities, Inc.; and Steel Dynamics Inc., Defendants.

No. 99 CIV. 10488 SAS.

United States District Court,
S.D. New York.

May 8, 2000.

James R. Safley, Thomas B. Hatch, Corey L. Gordon, Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, MN, David G. Glasser, Levin & Glasser, P.C., New York, NY, for Plaintiffs Gabriel Capital and Ariel Fund.

Howard Schiffman, Dickstein Shapiro Morin & Oshinsky LLP, Bruce E. Clark, Michael T. Tomanio, Jr., Jacqueline E. Bryks, Sullivan & Cromwell, New York, NY, for Defendants NatWest and McDonald.

Walter P. Loughlin, Latham & Watkins, New York, NY, David Siegel, David I. Gindler, Daniel P. Lefler, Irell & Manella LLP, Los Angeles, CA, Robert S. Walters, Cathleen M. Shrader, Barrett & McNagny, Fort Wayne, IN, for Defendant SDI.

### *OPINION AND ORDER*

SCHEINDLIN, District Judge.

Plaintiffs Gabriel Capital, L.P. ("Gabriel Capital") and Ariel Fund Ltd. ("Ariel Fund") have sued defendants NatWest Finance, Inc. ("NatWest"), McDonald Investments Inc. ("McDonald"), and Steel Dynamics Inc. ("SDI") for securities fraud arising from plaintiffs' purchase of certain debt securities (the "Note" or "Notes"). Plaintiffs allege that defendants violated section 10(b) of the Securities and Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, by making or participating in the making of untrue statements and by omitting material facts in order to induce plaintiffs to purchase the Notes. Plaintiffs also allege that, through the same conduct, defendants committed common law fraud, conspired to commit fraud, and aided and abetted fraud, all in violation of New York law.

All three defendants have moved to dismiss plaintiffs' Amended Complaint, pursuant to Fed.R.Civ.P. 12(b)(6), Fed.R.Civ.P. 9(b), and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(b)(2). Natwest and McDonald, both financial institutions, filed a joint motion to dismiss. SDI, a steel company, filed its own motion to dismiss. All three defendants argue that plaintiffs have failed to meet the various requirements for stating a claim of securities fraud.

## I. BACKGROUND

### A. Facts

The facts set forth below are taken from the Amended Complaint and are assumed to be true for purposes of this motion. *See Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir.1999) ("On a motion to dismiss under Rule 12(b)(6), the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff."). In 1995, Nakornthai Strip Mill Public Company Limited ("NSM") decided to construct an experimental mini-mill (the "Mini–Mill") near Chonburi, Thailand. *See* Amended Complaint ¶ 9. The Mini–Mill was to consist of: (1) a compact strip production thin-slab hot mill (the "Hot Mill") for steel melting, refining, casting, and hot rolling; (2) a facility (the "DRI facility") for the production of direct reduced iron ("DRI"), which would be used along with steel scrap as the raw material for making steel; and (3) downstream processing facilities for the production of high-quality pickled and oiled, cold-rolled, galvanized, and other value-added steel products (the "Finishing Facilities"). *See id.* The design of the Mini–Mill was experimental, incorporating new and unproven technology. *See id.* The person who persuaded NSM to construct the Mini–Mill—John W. Schultes (then an employee of U.S. Steel)—had never built or operated a mini-mill and only had participated in a feasibility study of the mini-mill concept. *See id.*

NSM initially obtained financing for the Mini–Mill from the Chairman of its Board of Directors, Sawasdi Horrungruang, and a group of Thai banks. *See id.* ¶¶ 9, 10. When those sources of financing dried up, due in part to an economic downturn in Thailand in 1997, Schultes approached defendant McDonald, an investment bank with particular expertise in the steel industry; McDonald agreed to help NSM raise funds in the United States. *See id.* ¶ 10.[1] McDonald then approached NatWest to become the lead underwriter. *See id.* ¶ 11.[2]

NatWest and McDonald were two of the four initial purchasers of the Notes, which were distributed in a private placement offering pursuant to Rule 144A, 17 C.F.R. § 230.144A. *See id.* ¶ 1. NatWest and McDonald worked together to market the Notes to institutional investors, including plaintiffs. *See id.* ¶ 11. As part of this marketing effort, NatWest and McDonald prepared an Offering Memorandum. *See id.* McDonald prepared detailed slides that were shown during "road shows." *See id.* Employees of defendants, including a McDonald employee named Gary Heasley, actively participated in these road shows. *See id.*

McDonald recognized that it needed to have a well-regarded mini-mill operator serve as a technical advisor to NSM, in order to induce investors to purchase the Notes. *See id.* ¶ 12. McDonald originally enlisted the help of Nucor Corporation ("Nucor"), which withdrew from the project in October 1997. *See id.* McDonald then turned to SDI, the only other mini-mill operator with the required experience.

---

**1.** Prior to this transaction, McDonald had helped raise capital for a number of steel concerns. *See id.* In particular, McDonald was one of the underwriters for the initial public offering of defendant SDI, the owner of a well-regarded mini-mill operation in the United States. *See id.*

**2.** NatWest is an experienced underwriter of high-yield bonds. *See id.* The participation of NatWest in this transaction provided NSM and McDonald with access to institutional investors. *See id.*

*See id.* Rather than limiting its role to technical advisor, SDI agreed to become a managing owner of NSM. *See id.* In exchange for its participation and promised services, SDI was given shares representing 10% of the equity in NSM, an annual fee of $2,000,000 (with the first payment made on March 12, 1998), a one-time incentive fee of $1,300,000 (to be paid no later than March 12, 1999), and a license to use the NSM technology. *See id.*

Keith Busse, the CEO of SDI, attended and actively participated in the road shows. *See id.* Busse endorsed NSM management, especially Schultes, and touted the design of the NSM mill as "A+." *Id.* In addition, Busse affirmed and reiterated the following representations made by NatWest and McDonald employees: (1) SDI had verified NSM's concept and operating assumptions; (2) SDI would be a "managing owner" of NSM; (3) SDI was in "complete control" of all of NSM's operations (along with McDonald and other strategic equity investors); and (4) NSM was using technology that had proven successful at SDI's facilities. *See id.*

In mid-to-late February 1998, Robert Sherman, an agent and employee of NatWest, contacted Thomas Mullen, an agent and employee of plaintiffs, seeking an opportunity to pitch the Notes. *See id.* ¶ 13. Mullen referred Sherman to Jack Mayer and Selin Cebeci, representatives of plaintiffs; Mayer and Cebeci agreed to meet with Sherman and other representatives of NatWest, McDonald, and NSM. *See id.*

On February 26, 1998, Mayer and Cebeci met with Schultes, representatives of NatWest, including Sherman, and representatives of McDonald, including Gary Heasley and David Stickler.[3] *See id.* ¶ 14. At this meeting, defendants displayed a series of slides used at other road shows, describing, discussing, and elaborating on the information contained therein. *See id.* ¶ 16. In particular, defendants emphasized the following points:

The Hot Mill, already fully constructed and through start-up, was producing high quality steel. The proceeds from the bond offering would be used only to provide working capital for the facility to begin commercial operations, and to construct the Finishing Facilities and DRI Facility. *See id.* ¶ 16(a).

Under the terms of two "Off–Take Agreements" already in place, two major German trading companies were obligated to take 100% of NSM's production for the first three years of operation and 25% for each of five additional years. *See id.* ¶ 16(b).

Technology used at NSM was state-of-the-art, proven technology already employed by SDI. "Defendants emphasized and reiterated the representations made by SDI at other road shows throughout the country that SDI was a 'managing owner' of NSM, that SDI had verified the NSM concept and operating assumptions, that SDI had analyzed and reviewed NSM's design and confirmed that it was viable, state-of-the-art, and proven, and that SDI, as a 'strategic equity investor' along with defendant McDonald and other non-Thai entities, was in complete control of operations, including purchasing, sales, and finance." *Id.* ¶ 16(c).

NSM's Thai owners and management would not control the funds, which would be controlled by an independent management company consisting of representatives of defendants and other non-Thai entities. "In particular, Gary Heasley, an employee of defendant McDonald who defendants represented would become NSM's chief financial officer following the completion of the Offering, assured plaintiffs that he would be moving to Thailand and that he would have complete control over NSM's funds, thus obviating any concerns plaintiffs had concerning mismanagement, theft, graft, self-dealing or other issues relating to NSM's existing management." *Id.* ¶ 16(d).

**3.** Plaintiffs allege on information and belief that Stickler attended this meeting. *See id.*

Scrap metal was available in sufficient quantities in Thailand at highly advantageous rates. *See id.* ¶ 16(e).

The NSM mill had an advantageous location relative to the harbor and a nearby Ford Motor Company plant, which NSM purportedly would supply with high quality finished steel. *See id.* ¶ 16(f).

Plaintiffs were given several other documents as part of the sales pitch.˙ Both prior to and at the February 26 meeting, NatWest gave plaintiffs several NatWest documents, with the notation "for internal use only," that purported to be NatWest's internal analysis of the valuation of the Notes. *See id.* ¶ 15. Shortly after the February 26 meeting, and prior to plaintiffs' investment decision, defendants gave them the final Offering Memorandum, dated March 2, 1998. *See id.* Finally, defendants gave plaintiffs a magazine published in the Fall of 1997 by the Indiana University–Purdue University Fort Wayne Alumni Association. The magazine's cover story was titled "Hot Metal Man—Keith Busse of Steel Dynamics." *See id.* ¶ 17. The article discusses Busse's career in the steel industry, focusing specifically on his expertise in the mini-mill industry. *See id.* SDI provided copies of this magazine to defendants, who then passed the magazine along to prospective purchasers.[4] *See id.*

After reviewing and relying upon the written materials provided to them, as well as the oral representations made by defendants, "plaintiffs together purchased $15.5 million in principal value of 12% NSM Senior Steel Mortgage Notes due 2006." *Id.* ¶ 18. This purchase took place on or about March 2, 1998. *See id.*

On August 24, 1998, SDI's counsel, Robert S. Walters, sent a memorandum to NSM regarding serious problems with the Mini–Mill (the "Walters memo"). *See id.* ¶ 19. The Walters memo "concluded, among other things, that 'the management and operational problems at the Mill are so pervasive and fundamental that, coupled with the further deterioration of the

steel markets in Asia and the enormous debt load that NSM is now carrying, it is doubtful that NSM can survive under the present circumstances.'" *Id.* (quoting Walters memo). In addition, the Walters memo "asserted that the representations in certain documents to be filed with the SEC, which included the representations made in the Offering Memorandum, were 'fundamentally incorrect and misleading,' and 'convey the impression of a Mill that, although facing substantial debt and start-up uncertainties, is basically sound, with reasonable prospects for success.' [The Walters memo] stated that this 'does not appear to be justified under the circumstances.'" *Id.* (quoting Walters memo).

The Walters memo also detailed a number of problems at the Mini–Mill, "the majority of which were problems known to the defendants at the time of the offering and fundamentally inconsistent with the representations made by the defendants concerning various aspects of the project." *Id.* ¶ 20. These included:

" 'The management team is not credible, ... and ... requires a major overhaul.' " *Id.* ¶ 20(a) (quoting Walters memo).

" 'Financial controls are woefully inadequate; poor accounting practices abound; checks get written and invoices get paid without appropriate justification, documentation or signatures; industry intelligent financial statements cannot be realistically produced; assets and inventories are valued above market; and accurate forecasting tools are not available.' " *Id.* ¶ 20(b) (quoting Walters memo).

" 'Scrap controls are non-existent to poor; quality scrap in the region is non-existent; and the prices charged by scrap vendors are outrageous relative to the purported grade.... There is also an enormous dollar value of useless scrap tied up on the ground.' " *Id.* ¶ 20(c) (quoting Walters memo).

---

4. Plaintiffs make this last allegation on information and belief. *See id.*

" 'It would appear that the scrap bay cranes cannot adequately support the volume of raw materials required for the ConSteel process. Additionally, the scrap bay crane scales do not correctly reflect the weight of material delivered to the ConSteel feeding system. Consequently, the proper operation of the electric arc furnace cannot be maintained.' " *Id.* ¶ 20(d) (quoting Walters memo).

" 'The single EAF melting battery [electric arc furnace], with the ConSteel feeding system, is inadequate and will not deliver the projected tonnages that are represented. Assuming the correction of certain design deficiencies, and given the limitation that the furnace cannot be conventionally charged, it would appear that, even under optimal operating circumstances, an annual output tonnage of perhaps 800,000–900,000 tons is more realistic. . . . [I]t may eventually be necessary to add a second, conventional, furnace battery in order to provide the necessary tonnage to properly support the caster and to better spread the tremendous fixed costs and carrying charge of the overall Mill.' " *Id.* ¶ 20(e) (quoting Walters memo).

" 'Theft, graft, and corruption need to be seriously investigated. . . . SDI suspects, but does not have the mandate or the resources to try to establish, that "sweetheart" deals, "commissions," and other serious contracting and payment practices have resulted or continue to result in a material amount of waste.' " *Id.* ¶ 20(f) (quoting Walters memo).

" 'NSM Management Co. is not operating the way it was envisioned and still does not have its full complement of members,' resulting in an authority vacuum." *Id.* ¶ 20(g) (quoting Walters memo).

SDI did not send the Walters memo to plaintiffs or other purchasers. *See id.*

On September 24, 1998, Enron Corp., which had purportedly agreed to develop an electric power plant in connection with the DRI facility, presented a report to the NSM Management Company and the NSM Board (the "Enron Report"). *See id.* ¶ 21. The Enron Report "documented the substantial use of proceeds [from the offering] in ways not disclosed in the Offering Memorandum and a substantial shortage of funds necessary to complete the DRI and Finishing Facilities." *Id.* The Enron Report was not provided to plaintiffs or other investors. *See id.*

Soon after the Enron Report, NSM's Board asked for and received Schultes' resignation. *See id.* NSM bondholders were subsequently notified of this resignation in a conference call. *See id.* ¶ 22. SDI then invited bondholders to attend a meeting at its headquarters on October 13, 1998. *See id.* Selin Cebeci and Burton Weinstein participated by telephone on behalf of plaintiffs. *See id.* At that meeting, Keith Busse, the CEO of SDI, "provided information to the investors which revealed that the defendants' representations made prior to the offering were false and misleading, including the fact that the mill had never produced high quality steel." *Id.*

In a letter dated December 30, 1998, Busse notified NSM and NSM Management Company that SDI was terminating its licensing and advisory agreements with NSM (the "Busse Letter"). *See id.* ¶ 23. In his letter, Busse "noted that SDI had found a 'far less complete mill, with serious design flaws, without the wherewithal to complete the project as represented and, even if completed as represented, without the capacity to produce the output upon which the financial projections were predicated.' " *Id.* (quoting Busse Letter). Busse did not circulate his letter to plaintiffs or other NSM bondholders. *See id.*

"Since December 1998, the mill has been shut down; efforts to construct the DRI facilities have been abandoned; there are insufficient funds remaining to complete construction of the DRI and Finishing Facilities; a default has been declared by the bondholders; and there are no present restructuring plans or any realistic prospects for restructuring." *Id.* ¶ 24.

## B. Procedural History

Gabriel Capital and Ariel Fund sued NatWest, McDonald, and SDI, filing their initial Complaint on October 12, 1999, and serving their Amended Complaint on November 5, 1999. In their Amended Complaint, plaintiffs allege that defendants made a number of false and misleading statements concerning: (1) the status of the Hot Mill; (2) the design of the Mini–Mill; (3) the ability of NSM to secure an adequate supply of scrap; (4) the "Off–Take Agreements;" (5) the management of NSM; and (6) the use of the proceeds of the offering. *See* Amended Complaint ¶¶ 25–37. Plaintiffs also pled justifiable reliance, *see id.* ¶¶ 38–40, scienter, *see id.* ¶¶ 41–46, and causation, *see id.* ¶ 47.

All three defendants have moved to dismiss the Amended Complaint pursuant to Rules 9(b) and 12(b)(6). NatWest and McDonald filed a joint motion to dismiss, while SDI filed its own motion.

## II. DISCUSSION

### A. Applicable Legal Standards

Dismissal of a complaint for failure to state a claim pursuant to Rule 12(b)(6) is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999); *see also Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998) ("The task of the court in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.") (quotation marks and citation omitted). Thus, to properly rule on such a motion, the court must accept as true all material facts alleged in the complaint and draw all reasonable inferences therefrom in the nonmovant's favor. *See Harris,* 186 F.3d at 247. Nevertheless, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears, Roebuck & Co.,* 87 F.3d

65, 70 (2d Cir.1996) (quotation marks and citation omitted).

Section 10(b) of the 1934 Act states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 sets forth specific practices that are considered "manipulative or deceptive." *See* 17 C.F.R. § 240.10b–5. Among other things, Rule 10b–5 provides that "[i]t shall be unlawful ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). To state a claim under section 10(b) and Rule 10b–5, plaintiffs must allege that in connection with the purchase or sale of securities: (1) defendants made a false material misrepresentation or omitted to disclose material information; (2) defendants acted with scienter; and (3) plaintiffs detrimentally relied upon defendants' fraudulent acts. *See Press v. Chemical Investment Services Corp.,* 166 F.3d 529, 534 (2d Cir.1999).

In addition, securities fraud actions are subject to the heightened pleading requirements of Rule 9(b):

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed.R.Civ.P. 9(b); *Chill v. General Electric Co.*, 101 F.3d 263, 267 (2d Cir.1996) ("[T]he actual fraudulent statements or conduct and the fraud alleged must be stated with particularity."). Finally, securities fraud actions are governed by the PSLRA, which contains its own heightened pleading requirements. The PSLRA states, in relevant part:

**(1) Misleading statements and omissions**

In any private action arising under this chapter in which the plaintiff alleges that the defendant -

**(A)** made an untrue statement of a material fact; or

**(B)** omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

**(2) Required state of mind**

■ In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b); *see Press,* 166 F.3d at 537–38 (explaining that the PSLRA "heightened the requirement for pleading scienter to the level used by the Second Circuit"). Under the heightened pleading requirements of Rule 9(b) and the PSLRA, plaintiffs must allege the first two elements of a securities fraud claim—fraudulent acts and scienter—with particularity. *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127–28 (2d Cir.1994) (height-ened pleading requirement for fraudulent acts); *Press,* 166 F.3d at 537–38 (height-ened pleading requirement for scienter).

■ Each of plaintiffs' state law claims has its own elements. "In New York state, to prove a fraud claim, a plaintiff must prove 'a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury.'" *AUSA Life Ins. Co. v. Ernst and Young,* 206 F.3d 202, 208 (2d Cir.2000) (quoting *Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 646 N.Y.S.2d 76, 80, 668 N.E.2d 1370 (1996)). "Once fraud is established, the conspiracy must be proven, requiring (i) an agreement between the conspirator and the wrongdoer and (ii) a wrongful act committed in furtherance of the conspiracy." *Vasile v. Dean Witter Reynolds Inc.,* 20 F.Supp.2d 465, 482 (E.D.N.Y.1998) (quotation marks and citation omitted), *aff'd,* 205 F.3d 1327, 2000 WL 236473 (2d Cir.2000). "To state a claim for aiding and abetting under New York law, a plaintiff must allege: (1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud." *Nigerian National Petroleum Corp. v. Citibank, N.A.,* No. 98 Civ. 4960(MBM), 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999) (quotation marks omitted).

**B. Motion to Dismiss Filed by NatWest and McDonald**

Defendants Natwest and McDonald set forth three grounds for dismissing the Amended Complaint. *First,* NatWest and McDonald contend that plaintiffs failed to plead the alleged fraudulent acts with sufficient particularity, because they failed to specify which defendant allegedly engaged in which conduct. *Second,* Natwest and McDonald argue that plaintiffs failed to

plead scienter with sufficient particularity, because plaintiffs have not identified facts that create a strong inference of fraudulent intent. *Third,* NatWest and McDonald claim that plaintiffs have failed to plead justifiable reliance, because plaintiffs' professed reliance on both the representations of NatWest and McDonald at the road show and the written representations in the Offering Memorandum was not reasonable in light of the specific disclaimers contained in the Offering Memorandum.

### 1. Failure to plead fraudulent acts with particularity

█ NatWest and McDonald first argue that plaintiffs have failed to plead the fraudulent acts with sufficient particularity. "To state a claim with the required particularity, a complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir.1999) (quotation marks and citation omitted). The Amended Complaint identifies three categories of misrepresentations. I will address each in turn.

### i. Offering Memorandum

The Amended Complaint identifies a number of statements from the Offering Memorandum and specifically alleges why those statements were false and misleading. *See* Amended Complaint ¶¶ 25–35. These alleged misrepresentations cover a number of different subjects: the status of the Hot Mill, the design of the Mini–Mill, the ability of NSM to secure an adequate supply of scrap, the ability of NSM to sell its products, the management of NSM, and the role of SDI in the Mini–Mill. *See id.* Plaintiffs specifically allege that NatWest and McDonald "directly participated in the drafting of" and "prepared" the Offering Memorandum. *Id.* ¶ 6 ("NatWest served as the lead underwriter of the Note offering and directly participated in the drafting of the Offering Memorandum."); ¶ 7

("[McDonald] was an underwriter of the Note offering, and directly participated in the drafting of the Offering Memorandum ...."); ¶ 11 ("NatWest and McDonald prepared [the] Offering Memorandum ...."); ¶ 42 ("NatWest employees, including Chris Berry and Ponty Singh, played a major role in drafting the Offering Memorandum ....").

█ NatWest and McDonald make three arguments as to why they cannot be held responsible for the alleged misrepresentations contained in the Offering Memorandum. *First,* Natwest and McDonald argue that a disclaimer in the Offering Memorandum states that none of the representations contained in that document are their representations. Although NatWest and McDonald do not identify the exact language on which they rely, there appear to be two possibilities:

NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, IS MADE BY THE INITIAL PURCHASERS AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION SET FORTH HEREIN, AND NOTHING CONTAINED IN THIS OFFERING MEMORANDUM IS, OR SHOULD BE RELIED UPON AS, A PROMISE OR REPRESENTATION, WHETHER AS TO THE PAST OR THE FUTURE. THE INITIAL PURCHASERS DO NOT ASSUME ANY RESPONSIBILITY FOR THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION.

...

THIS OFFERING MEMORANDUM INCLUDES CERTAIN STATEMENTS, ESTIMATES AND PROJECTIONS PROVIDED BY THE ISSUERS, THE COMPANY AND OTHER SOURCES BELIEVED BY THE ISSUERS AND THE COMPANY TO BE RELIABLE.... SUCH STATEMENTS, ESTIMATES AND PROJECTIONS REFLECT VARIOUS ASSUMPTIONS BY THE ISSUERS AND THE COMPANY

CONCERNING ANTICIPATED RESULTS AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE ISSUERS AND THE COMPANY.... THE ISSUERS AND THE COMPANY MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF SUCH STATEMENTS, ESTIMATES OR PROJECTIONS CONTAINED IN THIS OFFERING MEMORANDUM OR THAT ANY FORECAST CONTAINED HEREIN WILL BE ACHIEVED.

Affidavit of Jacqueline E. Bryks, counsel for McDonald ("Bryks Aff."), Ex. C., at iii. This disclaimer does *not* state that the initial purchasers have made no representations; rather, it states that the initial purchasers make no warranty about the accuracy or completeness of the representations. While the quoted language will be considered when analyzing the reliance prong, *see* pp. 32–35 *infra*, it does not undermine plaintiffs' allegations that both NatWest and McDonald drafted the Offering Memorandum and made the representations contained therein.[5]

■ *Second,* NatWest and McDonald contend that the alleged misrepresentations were not attributed to them at the time of public dissemination. In support, they cite *Wright v. Ernst & Young LLP,* 152 F.3d 169, 175 (2d Cir.1998) ("[T]he misrepresentation must be attributed to that specific actor at the time of public dissemination."), *cert. denied,* 525 U.S. 1104, 119 S.Ct. 870, 142 L.Ed.2d 772 (1999). In *Wright,* however, the press release that contained the alleged misrepresentations was issued by a company and did not mention the defendant accounting firm at all. *See id.* In this case, by contrast, the cover of the Offering Memorandum prominently lists both NatWest and McDonald as two of the four initial purchasers. *See* Bryks Aff., Ex. C. In addition, NatWest and McDonald gave the Offering Memorandum to plaintiffs as part of their sales pitch. *See* Amended Complaint ¶ 15. At this stage of the proceedings, that is a sufficient basis to conclude that the alleged misrepresentations were attributable to NatWest and McDonald.

■ *Third,* NatWest and McDonald argue that the Amended Complaint does not identify which statements in the Offering Memorandum were drafted by NatWest and which were drafted by McDonald. The Second Circuit has stated, however, that "[r]eference to the Offering Memorandum satisfies [Rule] 9(b)'s requirements as to identification of the time, place, and content of the alleged misrepresentations. Furthermore, no specific connection between fraudulent representations in the Offering Memorandum and particular defendants is necessary where ... defendants are insiders or affiliates participating in the offer of the securities in question." *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986). Plaintiffs allege that NatWest and McDonald arranged the financing of these Notes, drafted the Offering Memorandum, went on road shows,

---

**5.** NatWest and McDonald also argue that plaintiffs admitted that the representations at issue are "the factual assertions of NSM or those acting on behalf of NSM." Amended Complaint ¶ 41. At best, this statement is simply inconsistent with allegations elsewhere in the Amended Complaint that provide a sufficient basis for finding that NatWest and McDonald made the representations at issue. *See* Amended Complaint ¶¶ 6, 7, 11, 42. Reading the Amended Complaint as a whole, plaintiffs clearly have alleged that NatWest and McDonald made the representations. *See*

*Yoder v. Orthomolecular Nutrition Institute,* 751 F.2d 555, 562 (2d Cir.1985) ("It is elementary that, on a motion to dismiss, a complaint must be read as a whole, drawing all inferences favorable to the pleader."); *see also In re American Bank Note Holographics, Inc. Securities Litigation,* Nos. 99 Civ. 0412(CM), 99 Civ. 0661(CM), 2000 WL 365314, at *6 (S.D.N.Y. Apr. 6, 2000) ("[I]f the Complaint, read as a whole, can be construed to state any claim on which relief my be granted, [the Court] must not dismiss it.").

and sold the Notes to plaintiffs and others. *See* Amended Complaint ¶¶ 9–18. Those allegations are sufficient to cast NatWest and McDonald as "insiders or affiliates."

■ Nevertheless, NatWest and McDonald argue that *Luce* is inapplicable. *First,* they contend that they could not have been "insiders or affiliates" because they were acting as initial purchasers rather than underwriters. In support of this argument, they cite Rule 144A, 17 C.F.R. § 230.144A, which allows private placement offerings like the one at issue in this case. *See* Thomas Lee Hazen, *Treatise on the Law of Securities Regulation,* § 4.26.1, at 302 (3d ed. 1995). ("What [Rule 144A] does is to permit unlimited resales of securities that have never been registered under the 1933 Act, so long as all such sales are made to a specific class of large institutional investors."). Rule 144A(b) states:

> Any person, other than the issuer or a dealer, who offers or sells securities in compliance with the conditions set forth in paragraph (d) of this section shall be deemed not to be engaged in a distribution of such securities and therefore not to be an underwriter of such securities within the meaning of sections 2(11) and 4(1) of the [1933] Act.

17 C.F.R. § 230.144A(b). NatWest and McDonald correctly argue that, under Rule 144A, they were initial purchasers, not underwriters, of the Notes. *See* Hazen, *Securities Regulation,* § 4.26.1, at 302 ("Rule 144A, like Rule 144, classified certain offers and sales as not involving a distribution, so that persons participating in such offers and sales are not considered 'underwriters' under section 2(11)."). But Rule 144A makes clear that its restrictive definition is of limited application. *See* 17 C.F.R. § 230.144A, Preliminary Note 1 ("This section relates solely to the application of section 5 of the [1933] Act and not to antifraud or other provisions of the federal securities laws.").[6] Although NatWest and McDonald were not underwriters for purposes of the 1933 Act, their

participation in the financing and sale of the Notes, especially with respect to drafting the Offering Memorandum, make them "insiders or affiliates" under *Luce.*

*Second,* NatWest and McDonald cite cases stating that "where counsel drafted the offering memorandum and were acting on behalf of the general partner, they are not, without more, corporate insiders or affiliates to whom the relaxed pleadings standards are applicable." *Friedman v. Arizona World Nurseries Ltd.,* 730 F.Supp. 521, 531 (S.D.N.Y.1990), *aff'd,* 927 F.2d 594 (2d Cir.1991); *see also Stevens v. Equidyne Extractive Industries,* 694 F.Supp. 1057, 1062–63 (S.D.N.Y.1988). In those cases, however, the attorneys or accountants who prepared portions of the Offering Memorandum did not subsequently participate in the sale of the securities. As noted above, plaintiffs' allegations in this case are much broader. *Cf. Shapiro v. Cantor,* 123 F.3d 717, 721 (2d Cir.1997) ("[A]n accountant shares in an insider's duty to disclose if the accountant exchanges his or her role for a role as an insider who vends the company's securities."). At this stage, plaintiffs have sufficiently alleged that NatWest and McDonald are responsible for the alleged misrepresentations in the Offering Memorandum.

### ii. Slides and oral representations

■ Plaintiffs also allege that NatWest and McDonald made misrepresentations in connection with a road show presentation:

> On or about February 26, 1998, representatives of defendant NatWest, including [Robert Sherman], representatives of defendant McDonald, including Gary Heasley and, upon information and belief, David Stickler, and John Schultes, CEO of NSM, met with Mr. Mayer and Ms. Cebeci [representatives of plaintiffs] in the plaintiffs' offices at 450 Park Avenue, New York City. At this meeting, defendants presented Mr. Mayer and Ms. Cebeci with written materials con-

**6.** Section 5 of the 1933 Act details the prospectus and registration statement require-

ments related to the sale of securities. *See* 15 U.S.C. § 77e.

cerning the NSM project, including a bound set of copies of the slides used by the defendants at other road shows throughout the country. ... [T]he defendants went through each of the slides, describing, discussing, and elaborating on the information contained therein.

Amended Complaint ¶¶ 14, 16. Plaintiffs allege that NatWest and McDonald made a number of oral representations on specific topics, including: (i) the status of the Hot Mill; (ii) the use of the proceeds of the offering; (iii) the ability of NSM to sell its products; (iv) the role of SDI in the Mini–Mill; (v) the management of NSM; (vi) the availability of scrap metal; and (vii) the advantageous location of the Mini–Mill. *See id.* ¶ 16(a)-(f). Plaintiffs then explain how a number of those oral representations, as well as quoted statements from the slides, were allegedly false. *See id.* ¶¶ 25-37.

Natwest and McDonald argue that plaintiffs have failed to plead their allegations with sufficient particularity, because they do not identify the speaker of each alleged oral misrepresentation. Plaintiffs have identified the specific date of the meeting, at least one of the representatives from both NatWest and McDonald who attended the meeting, and the specific statements alleged to be fraudulent. Given this level of specificity, plaintiffs have placed NatWest and McDonald on notice and pleaded their claim with sufficient particularity, despite their inability to specifically identify the speaker of each statement. *See Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995) ("Rule 9(b) is intended to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit.") (quotation marks and citation omitted). This conclusion is reinforced by the fact that many of the alleged oral misrepresentations mirror allegedly false statements in the Offering Memorandum and slides.

Turning to the slides, NatWest and McDonald argue that three of the alleged misrepresentations cannot be located in those slides and that all of the other alleged misrepresentations come from a section entitled "Investment Considerations," whose cover page states: "Presented by John W. Schultes, President and CEO, Nakornthai Strip Mill Public Company, Ltd." Affidavit of Corey L. Gordon, counsel for plaintiffs ("Gordon Aff."), Ex. A. NatWest and McDonald argue that, because Schultes presented the slides that allegedly contain misrepresentations, they cannot be held responsible for the representations on those slides. The Amended Complaint clearly alleges, however, that "the defendants went through each of the slides, describing, discussing, and elaborating on the information contained therein." Amended Complaint ¶ 16. Accepting that claim as true, NatWest and McDonald adopted the slides presented by Schultes as their own when they made oral representations about those slides. In addition, the Amended Complaint claims that McDonald "directly participated in the drafting of ... slides containing many of the material misrepresentations which were made at a presentation to the plaintiffs in New York." *Id.* ¶ 7.

### iii. NatWest documents

Finally, the Amended Complaint alleges that Natwest "provided to the plaintiffs several NatWest documents with the notation 'for internal use only' that purported to be NatWest's own internal analysis of the valuation of NSM bonds and related matters." Amended Complaint ·¶ 15. Plaintiffs allege that these NatWest documents misrepresented the role of Koch Industries·("Koch") in the Mini–Mill. *See id.* ¶ 45. According to plaintiffs, NatWest misrepresented Koch's reasons for deciding not to become an equity owner in NSM, as well as Koch's role in managing a port crucial to NSM's operations. *See id.* Plaintiffs have pled an adequate basis for their allegation that those documents al-

legedly contain false misrepresentations by Natwest.[7]

## 2. Failure to plead scienter with particularity

 Next, NatWest and McDonald argue that plaintiffs have failed to plead scienter with sufficient particularity. In order to satisfy this requirement,

plaintiffs must allege facts that give rise to a strong inference of fraudulent intent. The requisite strong inference of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.

*Acito,* 47 F.3d at 52 (quotations marks and citations omitted).

 Plaintiffs argue that they have plead sufficient facts to raise a strong inference of conscious misbehavior or recklessness. The Second Circuit has stated:

[R]eckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it. An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of ... recklessness.

*Chill,* 101 F.3d at 269 (quotation marks and citations omitted).

*First,* the Amended Complaint alleges that "[p]rior to March 1998 [when the Offering Memorandum was complete and plaintiffs purchased the Notes], both David Wheeler of NatWest and David Stickler of McDonald were warned about NSM's inadequate management, design issues, infrastructure problems, and overly optimistic predictions." Amended Complaint ¶ 44.

Plaintiffs claim that Stickler met with representatives of Koch Industries, who told him of their concerns. *See id.* Plaintiffs also claim that Wheeler "was aware of a meeting between Koch and Nucor where these same concerns were expressed." *Id.* Thus, the Amended Complaint contains an allegation that NatWest and McDonald knew that some of their representations were false or misleading.

*Second,* the Amended Complaint explains that some of the representations made by NatWest and McDonald were contradicted by the primary source documents for those representations. For example, plaintiffs allege that the Offering Memorandum and slides contained representations about SDI's role in the Mini-Mill that were contradicted by the written agreement between SDI and NSM. *See* Amended Complaint ¶¶ 28(h), 35(d). Similarly, plaintiffs allege that representations concerning promises by two German corporations to purchase the Mini-Mill's output were contradicted by the agreements between NSM and those corporations. *See id.* ¶¶ 31–32. Plaintiffs also allege that basic investigation would have revealed that certain other representations—about the availability of scrap, the quality and structure of NSM's management, and the involvement of Koch Industries—were false. *See id.* ¶¶ 29–30, 33–35, 45.

NatWest and McDonald argue that plaintiffs are relying improperly on their alleged duty as underwriters to conduct due diligence, because the Second Circuit has held repeatedly that the failure to conduct due diligence cannot establish the scienter of accountants or others. *See Chill,* 101 F.3d at 270 ("Fraud cannot be inferred simply because GE might have been more curious or concerned about the activity at Kidder."); *Shields,* 25 F.3d at 1129 ("The pleading strongly suggests that the defendants should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud.").[8] NatWest and Mc-

---

7. Plaintiffs also allege that defendants gave them a magazine article about Keith Busse, the CEO of SDI. *See* Amended Complaint ¶ 17. They do not allege, however, that anything in the article constituted a misrepresentation.

8. NatWest and McDonald also deny that such a duty even existed in this case, because they

Donald analogize this case to *In re WRT Energy Securities Litigation,* in which plaintiffs alleged that the underwriter defendants, who had prepared a number of optimistic analyst reports, "either knew or recklessly disregarded virtually every single negative fact concerning WRT which plaintiffs have alleged in the Complaint." *In re WRT Energy Securities Litigation,* No. 96 Civ. 3610, 3611(JFK), 1999 WL 178749, at *10 (S.D.N.Y. Mar. 31, 1999) ("*WRT II*"). The court rejected plaintiffs' claim:

> At base, these allegations claim that if Oppenheimer and Schroder had properly done their jobs as underwriters and performed due diligence adequately, they would have uncovered the truth about WRT. These allegations constitute negligence at best, and these types of allegations against an underwriter have always been insufficient to establish scienter under the federal securities laws.

*WRT II,* 1999 WL 178749, at *10; *see also In re WRT Energy Securities Litigation,* No. 96 Civ. 3610, 3611(JFK), 1997 WL 576023, at *13 (S.D.N.Y. Sep. 15, 1997) ("*WRT I* ") ("[T]he allegation that a defendant's due diligence investigation should have turned up the asserted improprieties in the offering materials is insufficient to satisfy [Rule] 9(b).") (quotation marks and citation omitted).

Unfortunately for NatWest and McDonald, *WRT Energy* is inapposite. Plaintiffs are not merely alleging that NatWest and McDonald failed to discover that some analyst reports relied on false assumptions. Rather, plaintiffs allege that NatWest and McDonald drafted the Offering Memorandum, prepared the slides, and attended the road show, all of which contained a large number of false or misleading representations contradicted by basic source documents or obvious facts. Because the true facts could be found in such obvious sources, NatWest and McDonald either knew that their representations were false or misleading when they were made or, at least, acted with reckless disregard as to whether their representations were false or misleading. Thus, the facts alleged in the Amended Complaint, if true, create a strong inference of fraudulent intent. *See In re MCI Worldcom, Inc. Securities Litigation,* No. 99–CV–3136 (ILG), 2000 WL 381966, at *8 (S.D.N.Y. Apr. 13, 2000) (plaintiff alleged conscious misbehavior or recklessness where representative of defendant falsely denied that defendant had registered a domain name and intended to merge with another company); *In re American Bank Note Holographics, Inc. Securities Litigation,* Nos. 99 Civ. 0412(CM), 99 Civ. 0661(CM), 2000 WL 365314, at *19–*21 (S.D.N.Y. Apr. 6, 2000) (plaintiff alleged conscious misbehavior or recklessness where defendants made a large number of extremely false statements over several years and were in a position to know that the statements were false); *Baxter v. A.R. Baron & Co.,* No. 94 Civ. 3913(JGK), 1996 WL 586338, at *4 (S.D.N.Y. Oct. 11, 1996) ("The plaintiffs have alleged particular statements by [defendant] which misrepresented specific facts that, under the circumstances pleaded, [defendant] knew or was reckless in not knowing were false. Given the number and specificity of the misrepresentations, the plaintiffs have alleged sufficient facts at this stage of the pleadings.").[9]

### 3. Failure to plead justifiable reliance

Finally, NatWest and McDonald argue that plaintiffs failed to sufficiently plead both actual and justifiable reliance on the alleged misrepresentations. Plaintiffs clearly plead actual reliance: "The plaintiffs reviewed and relied upon the written materials provided to them by the defen-

were not underwriters; the Court addressed this issue *supra* Part B.1.i.

**9.** Because plaintiffs have pled facts supporting a strong inference of conscious misbe-

havior or recklessness, there is no need to address whether plaintiffs have sufficiently alleged motive and opportunity.

dants, as well as the oral representations made by the defendants, in making the decision to invest in the NSM notes." Amended Complaint ¶ 18. Whether plaintiffs have sufficiently alleged facts indicating that their reliance was justifiable presents a closer question. Plaintiffs claim that they relied on NatWest's and McDonald's duty as underwriters to conduct proper due diligence.[10]

NatWest and McDonald rely heavily on the language of the Offering Memorandum in order to demonstrate that plaintiffs could not have justifiably relied on their representations. *First,* NatWest and McDonald contend that plaintiffs could not rely on any representations contained in the Offering Memorandum itself, because the Offering Memorandum contained the following disclaimer:

> NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, IS MADE BY THE INITIAL PURCHASERS AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION SET FORTH HEREIN, AND NOTHING CONTAINED IN THIS OFFERING MEMORANDUM IS, OR SHOULD BE RELIED UPON AS, A PROMISE OR REPRESENTATION, WHETHER AS TO THE PAST OR THE FUTURE. THE INITIAL PURCHASERS DO NOT ASSUME ANY RESPONSIBILITY FOR THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION.

Bryks Aff., Ex. C., at iii. *Second,* NatWest and McDonald argue that plaintiffs could not rely on any representations made prior to the Offering Memorandum—in the slides or at the road show—because the Offering Memorandum contained a second disclaimer:

> No dealer, salesperson or other person has been authorized in connection with the offering made hereby to give any information or to make any representa-

tion not contained in this Offering Memorandum, and, if given or made, such information or representation must not be relied upon as having been authorized by the Note Issuers, the Company or by the Initial Purchasers.

Bryks Aff., Ex. C, at Back Cover.

■ Putting aside whether the disclaimer contained in the Offering Memorandum was sufficient to preclude reliance on representations in that document, the disclaimer relating to all other representations clearly was not sufficient to preclude justifiable reliance on the alleged representations made by NatWest and McDonald in the slides and at the road show. As plaintiffs note, the disclaimer states that all other representations cannot be "relied upon as having been authorized by the Note Issuers, the Company, or by the Initial Purchasers." In this case, however, the Initial Purchasers were the ones making the other representations.[11] NatWest and McDonald cannot use this disclaimer to deny that they authorized their own representations.

■ Alternatively, NatWest and McDonald argue that any prior representations were contradicted by the Offering Memorandum, making reliance on those prior representations unreasonable. *See Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 9 (2d Cir.1996) ("Representations made by the defendants at the roadshows are immaterial since they are contradicted by the plain and prominently displayed language in the prospectuses."). Although NatWest and McDonald do identify several contradictions between earlier representations and the Offering Memorandum, their list is by no means exhaustive. Plaintiffs have identified a number of allegedly false representations in the slides that are not contradicted by the Offering Memorandum. *See* Amended Complaint ¶¶ 25–35. For example, plain-

---

**10.** Again, NatWest and McDonald challenge the theory underlying this alleged duty, arguing that they were not underwriters. This argument is addressed *supra* Part B.1.i.

**11.** NatWest and McDonald argue that they did not make any representations at the road show. This argument was addressed *supra* Part B.1.ii.

tiffs allege that a slide stated " 'Mini-mill designed to combine commercially proven technologies in a unique manner that results in the least cost production of the highest quality products' " and the Offering Memorandum stated " 'the Mill's design utilizes a unique combination of the best commercially proven technologies currently in use in some of the most efficient and highest quality steel manufacturing facilities in the world,' " and that both of these statements were false or misleading. Amended Complaint ¶¶ 27–28. The representations made at the road show and in the slides contained no disclaimer analogous to the ones in the Offering Memorandum. As a result, plaintiff could justifiably rely on those representations.

### 4. Conclusion

I note that plaintiffs have merely alleged a set of facts from which a jury reasonably could find that NatWest and McDonald violated section 10(b) and Rule 10b–5. *See Wright*, 152 F.3d at 173 ("The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.") (quotation marks and citation omitted). During the course of this litigation, plaintiffs may fail to uncover sufficient evidence to support their factual allegations. For example, discovery might reveal that NatWest and McDonald played a relatively small role in preparing the Offering Memorandum or the slides. Even if plaintiffs do proffer sufficient evidence to survive a motion for summary judgment, a jury might conclude that NatWest and McDonald did not violate section 10(b) or Rule 10b–5. At this stage in the proceedings, however, plaintiffs have alleged enough to warrant that discovery proceed.

### C. Motion to Dismiss Filed by SDI

Defendant SDI moves to dismiss the Amended Complaint because plaintiffs

failed to allege that SDI made a misrepresentation to them. Plaintiffs concede that SDI did not make a misrepresentation directly to them, because SDI did not prepare the Offering Memorandum and no one from SDI was present at the road show attended by plaintiffs.[12] Nevertheless, plaintiffs allege that SDI made misrepresentations to them through Natwest and McDonald, who "emphasized and reiterated the representations made by SDI at other road shows throughout the country." Amended Complaint ¶ 16(c). Plaintiffs argue that those indirect misrepresentations are sufficient to support primary liability under Rule 10b–5.

In *Central Bank of Denver v. First Interstate Bank*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court held that aiding and abetting liability was not available under section 10(b) and emphasized that "[a] plaintiff must show reliance on the defendant's misstatement or omission to recover under 10b–5." *Id.* at 180, 114 S.Ct. 1439. Following *Central Bank*, the Second Circuit has indicated that a defendant does not have to make a misrepresentation directly to a plaintiff, so long as the defendant knows or should know that the misrepresentation will be communicated to the plaintiff. *See Shapiro*, 123 F.3d at 720 (" '[I]n order for accountants to use or employ a deception actionable under antifraud law, they must themselves make a false or misleading statement (or omission) that they know or should know will reach potential investors.' ") (quoting *Anixter v. Home–Stake Production Co.*, 77 F.3d 1215, 1226 (10th Cir.1996)). Nevertheless, the party communicating the misrepresentation must attribute that misrepresentation to the defendant. *See Wright*, 152 F.3d at 175 ("[A] secondary actor cannot incur primary liability ... for a statement not attributed to that actor at the time of its

---

**12.** In their original Complaint, plaintiffs did allege that Keith Busse, the CEO of SDI, was present at the road show they attended. This allegation was removed from the Amended Complaint. *See* Memorandum of Law in Support of Defendant Steel Dynamics, Inc.'s Motion to Dismiss ("SDI Mem.") at 2; Plaintiffs' Memorandum of Law in Opposition to Defendant Steel Dynamics, Inc.'s Motion to Dismiss ("Pl. SDI Mem.") at 6.

dissemination.... [R]eliance only on representations made by others cannot itself form the basis of liability.") (quotation marks and citation omitted).

The problem for plaintiffs is that the Amended Complaint does not allege that the misrepresentations were attributed to SDI at the time of their dissemination. The Amended Complaint states in relevant part:

> Defendants emphasized that the technology employed at NSM was state-of-the-art, and was proven technology already employed by SDI. Defendants emphasized and reiterated the representations made by SDI at other road shows throughout the country that SDI was a 'managing owner' of NSM, that SDI had verified the NSM concept and operating assumptions, that SDI had analyzed and reviewed NSM's design and confirmed that it was viable, state-of-the-art, and proven, and that SDI, as a 'strategic equity investor' along with defendant McDonald and other non-Thai entities, was in complete control of operations, including purchasing, sales, and finance.

Amended Complaint ¶ 16(c). Standing alone, this paragraph could be read to claim that the misrepresentations were attributed to SDI when NatWest and McDonald "emphasized and reiterated" them. The fatal flaw in the Amended Complaint is found in an earlier paragraph:

> Keith Busse, the CEO of SDI, attended and actively participated in many of the road shows used to induce prospective investors to purchase the Notes. In particular, Mr. Busse endorsed NSM management, referring specifically to Mr. Schultes, and touted the design of the mill, labeling it as "A+." At road shows, Mr. Busse affirmed and reiterated representations made by NatWest and McDonald that SDI had verified NSM's concept and operating assumptions, that SDI would be a 'managing owner' of NSM, that SDI was in 'complete control' of all of NSM's operations (along with defendant McDonald and other strategic equity investors), and that NSM was using technology that had

been proven successful at SDI's facilities.

Amended Complaint ¶ 12. A comparison of these two paragraphs indicates that plaintiffs have alleged that the same misrepresentations originated both from NatWest and McDonald and from SDI. Consequently, plaintiffs have failed to identify the source of the misrepresentations concerning SDI. *See Wright*, 152 F.3d at 175 ("[T]he misrepresentation must be attributed to that specific actor at the time of public dissemination, that is, in advance of the investment decision.").

This flaw becomes clearer when this case is compared to the primary case cited by plaintiffs—*In re Kidder Peabody Securities Litigation*, 10 F.Supp.2d 398 (S.D.N.Y.1998). Plaintiffs cite the following passage from *Kidder Peabody:*

> [T]hat the defendant must make a misrepresentation does not mean that the defendant must communicate that misrepresentation directly to the plaintiff. Rather, where the defendant has made a misstatement but used another actor to deliver the message, the defendant still may be liable as a primary violator. In such circumstances, it was the defendant's original statement which misled investors—the person who communicated the statement to investors served as a mere conduit for the defendant's statement. Thus, if plaintiffs can show that defendants were the original and knowing source of a misrepresentation and that defendants knew or should have known that misrepresentation would be communicated to investors, primary liability should attach.

*Id.* at 407 (quotation marks and citations omitted). *First*, as explained above, the contrast between paragraphs 12 and 16 cast doubt on whether SDI was the original and knowing source of the misrepresentations. In *Kidder Peabody*, there was no dispute that the defendants were the original and knowing source of the misstatements. *See id.* at 407. *Second*, the Amended Complaint does not plead facts

leading to the conclusion that NatWest and McDonald were "mere conduits" for SDI. *Cf. id.* ("Also undisputed is that GE's role in disseminating this information was limited to serving as a conduit.... When GE opened its mouth regarding Kidder, Kidder's words came out.").

At most, the Amended Complaint alleges that SDI knew that NatWest and McDonald would make misrepresentations to plaintiffs about its role in the Mini–Mill. What the Amended Complaint fails to allege is that the misrepresentations communicated to the plaintiffs by NatWest and McDonald were SDI's misrepresentations. *Cf. Cooper v. Pickett,* 137 F.3d 616, 624 (9th Cir.1997) ("Merisel is alleged to have made misleading statements to the analysts with the intent that the analysts communicate those statements to the market. This is not aiding and abetting or secondary liability; the complaint alleges that Merisel is liable for its own false statements to the analysts."); *see also S.E.C. v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1471–72 (2d Cir.1996) (owner of securities firm liable as primary violator where "illegal activity could only have occurred at the direction of ... upper-level management"); *Mishkin v. Ageloff,* No. 97 Civ. 2690, 1998 WL 651065, at *18–*19 (S.D.N.Y. Sep. 23, 1998) (finding primary liability where defendant allegedly " 'initiated, approved, directed, and carried out the entire scheme' ") (quoting Complaint).

Prior to *Central Bank,* the Amended Complaint would have adequately pled aiding and abetting liability. *See* Amended Complaint ¶ 8 (SDI "actively participated" and "knowingly participated" in the alleged scheme), ¶ 12 ("NatWest and McDonald engaged defendant SDI to assist in their scheme ...."). After *Central Bank,* however, those allegations are not sufficient to sustain a claim against SDI under Rule 10b–5. *See Shapiro,* 123 F.3d at 720 ("Allegations of 'assisting,' 'participating in,' 'complicity in' and similar synonyms used throughout the complaint all fall with-

in the prohibitive bar of *Central Bank.*"). As a result, SDI's motion to dismiss plaintiffs' federal securities claim is granted.[13]

SDI argues that plaintiffs should not be given leave to amend their complaint, because there is no reason to believe that plaintiffs could allege that SDI made any misrepresentations to them. The Second Circuit has explained that leave to amend should be freely granted:

> Although the decision of whether to allow plaintiffs to amend their complaint is left to the sound discretion of the district court, there must be good reason to deny the motion. One good reason to deny leave to amend is when such leave would be futile.

*Acito,* 47 F.3d at 55 (citation omitted). At this stage, it is not clear whether allowing plaintiffs leave to amend would be futile. For example, NatWest and McDonald might have attributed some of the representations at the road show to SDI. Leave to amend is therefore granted.

### D. State Law Claims

■■■ Plaintiffs also brought claims against all three defendants for common law fraud, conspiracy to commit fraud, and aiding and abetting fraud, all in violation of New York law. As explained above, plaintiffs have adequately pled their federal securities fraud claim against NatWest and McDonald. *See supra* Part B. "[T]he elements of common law fraud are essentially the same as those which must be pleaded to establish a claim under § 10(b) and Rule 10b–5." *Scone Investments, L.P. v. American Third Market Corp.,* No. 97 Civ. 3802, 1998 WL 205338, at *10 (S.D.N.Y. Apr. 28, 1998). Thus, plaintiffs' common law fraud claim against NatWest and McDonald should not be dismissed. NatWest and McDonald admit that plaintiffs' conspiracy and aiding and abetting claims are derivative of their federal and common law fraud claims. *See* Memorandum in Support of NatWest Finance Inc.'s

---

**13.** Because plaintiffs have not adequately pled that SDI made a material misrepresentation, there is no need to discuss SDI's claim that the pleading of scienter also was inadequate.

and McDonald Investments Inc.'s Motion to Dismiss at 9 n.4. Therefore, those claims also survive.

██ On the other hand, plaintiffs failed to adequately plead their federal securities fraud claim against SDI. *See supra* Part C. Plaintiffs admit that their claim for common law fraud relies on the same allegations. *See* Pl. SDI Mem. at 19. Therefore, plaintiffs' common law fraud claim against SDI also must be dismissed, with leave to amend.

SDI argued in its opening brief that plaintiffs had not properly pled their claims for aiding and abetting fraud and conspiracy to commit fraud. *See* SDI Mem. at 19–22. In response, plaintiffs simply stated that they have sufficiently alleged a federal securities fraud claim. *See* Pl. SDI Mem. at 19. Although plaintiffs provided little help to the Court with respect to these issues, they must be addressed.

### 1. Conspiracy

Under New York law, a claim of civil conspiracy requires "(i) an agreement between the conspirator and the wrongdoer and (ii) a wrongful act committed in furtherance of the conspiracy." *Vasile v. Dean Witter Reynolds Inc.*, 20 F.Supp.2d 465, 482 (E.D.N.Y.1998) (quotation marks and citation omitted), *aff'd*, 205 F.3d 1327, 2000 WL 236473 (2d Cir.2000). Plaintiffs have failed to allege either of these elements. In fact, the only mention of a conspiracy in the Amended Complaint comes on the penultimate page, in the claim itself: "Defendant SDI conspired with the underwriter defendants to commit fraud . . . by its knowing or reckless participation in the making of fraudulent statements at the road shows." Amended Complaint ¶ 55. "[T]o survive a motion to dismiss, a complaint must contain more than general allegations in support of the conspiracy. Rather, it must allege the specific times, facts, and circumstances of the alleged conspiracy." *Fitzgerald v. Field*, No. 99 Civ. 3406(RWS), 1999 WL 1021568, at *4 (S.D.N.Y. Nov. 9, 1999)

(citations omitted). Thus, plaintiffs' claim against SDI for conspiracy to commit fraud must be dismissed, with leave to amend.

### 2. Aiding and Abetting

██ "To state a claim for aiding and abetting under New York law, a plaintiff must allege: (1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud." *Nigerian National Petroleum Corp. v. Citibank, N.A.*, No. 98 Civ. 4960(MBM), 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999) (quotation marks omitted). As noted above, the Amended Complaint states a claim of securities fraud against NatWest and McDonald. *See supra* Part B. This satisfies the first element. In addition, with all reasonable inferences drawn in plaintiffs' favor, the Amended Complaint alleges that SDI knew that NatWest and McDonald would make misrepresentations about its role in the Mini–Mill. According to the Amended Complaint, Keith Busse of SDI had attended other road shows at which NatWest and McDonald made misrepresentations about SDI's role. *See* Amended Complaint ¶ 12. It is reasonable to infer that SDI knew that NatWest and McDonald would make the same misrepresentations at all other road shows, including the one attended by plaintiffs.

Whether plaintiffs have adequately alleged that SDI substantially assisted in the fraud presents a closer question. Plaintiffs do not allege that SDI participated in the drafting of the Offering Memorandum or slides. *See ABF Capital Management v. Askin Capital Management, L.P.*, 957 F.Supp. 1308, 1328 (S.D.N.Y.1997) ("[W]here the primary fraud claim is predicated on misrepresentations in or omissions from documents, the substantial assistance of an unrelated third party must generally relate to the preparation or dissemination of the false statements themselves."). In addition, SDI correctly ar-

**512**

gues that a claim of substantial assistance cannot be based on a failure to correct misrepresentations, absent a duty to speak. *See National Westminster Bank USA v. Weksel,* 124 A.D.2d 144, 511 N.Y.S.2d 626, 629 (1st Dept.1987) ("We know of no case where mere inaction by a defendant has been held sufficient to support aider and abettor liability for fraud.... Here, there was no independent duty to act on the part of defendant law firm.") (citations omitted), *appeal denied,* 70 N.Y.2d 604, 519 N.Y.S.2d 1027, 513 N.E.2d 1307 (1987).

Nevertheless, plaintiffs have sufficiently alleged that SDI substantially assisted in the fraud, because SDI's participation in this scheme played a substantial role in inducing plaintiffs and other investors to purchase the Notes. *See* Amended Complaint ¶ 12 ("As McDonald admits, having SDI as a 'strategic partner in the transaction' gave the plaintiffs and other potential investors 'a tremendous amount of comfort that NSM would be among the better managed, most efficient steel mills in the world.'"). According to plaintiffs, SDI was one of only two companies with sufficient experience to advise the Mini–Mill and the other company—Nucor—withdrew from the project. *See id.* "The substantial assistance element has been construed as a causation concept, requiring that the plaintiff allege that the acts of the aider and abettor proximately caused the harm upon which the primary liability is predicated." *Primavera Familienstiftung v. Askin,* 173 F.R.D. 115, 126 (S.D.N.Y.1997). Plaintiffs allege that SDI's participation in the Mini–Mill was the proximate cause of their decision to invest. *See* Amended Complaint ¶ 55 ("Defendant SDI knew that its participation in the fraudulent scheme would give credibility to the offering and that institutional investors, such as the plaintiffs, would rely upon its participation and endorsement of NSM's management and the design of the facility in deciding whether to purchase the Notes."). Thus, as to plaintiffs' state law claim against SDI for aiding and abetting fraud, SDI's motion to dismiss is denied.

### III. CONCLUSION

For the foregoing reasons, the motion to dismiss filed by NatWest and McDonald is DENIED and the motion to dismiss filed by SDI is GRANTED IN PART and DENIED IN PART. Plaintiffs are granted leave to amend their Amended Complaint against SDI. Any such amendment must be filed within 21 days of this Order. A conference is scheduled for June 8, 2000 at 4:30 p.m.

SO ORDERED.